# IN THE SUPREME COURT OF TEXAS

════════════
No. 11-0447
════════════

LEE C. RITCHIE, ET AL., PETITIONERS,

v.

ANN CALDWELL RUPE, AS TRUSTEE FOR THE DALLAS GORDON RUPE, III 1995
FAMILY TRUST, RESPONDENT

════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS
════════════════════════════════════════════════

**Argued on February 26, 2013**

JUSTICE BOYD delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE LEHRMANN, and JUSTICE DEVINE joined.

JUSTICE GUZMAN filed a dissenting opinion, in which JUSTICE WILLETT and JUSTICE BROWN joined.

In this case, a minority shareholder in a closely held corporation alleged that the corporation's other shareholders, who were also on the board of directors, engaged in "oppressive" actions and breached fiduciary duties by, among other things, refusing to buy her shares for fair value or meet with prospective outside buyers. The directors essentially admit to this conduct but insist that they were simply doing what was best for the corporation. For the most part, the jury sided with the minority shareholder, and the trial court ordered the corporation to buy out her shares for $7.3 million. The court of appeals agreed that the directors' refusal to meet with prospective purchasers was "oppressive" and upheld the buy-out order. We hold that this conduct was not "oppressive"

under the statute on which the minority shareholder relies, and in any event, the statute does not authorize courts to order a corporation to buy out a minority shareholder's interests. Moving beyond the statutory claims, we decline to recognize or create a Texas common-law cause of action for "minority shareholder oppression." We thus reverse the court of appeals' judgment. Because the court of appeals upheld the judgment based on the oppression claim and did not reach the breach-of-fiduciary-duty claim, we remand the case to the court of appeals.

## I.
## Background

Rupe Investment Corporation (RIC) is a Texas closely held corporation.[1] Before this dispute arose, RIC's board of directors had four members: Paula Dennard, who chaired the board; Dallas Gordon Rupe, III (Buddy), who was Dennard's brother; Lee Ritchie, who served as president of RIC; and Dennis Lutes, an attorney whose clients included RIC, Dennard, and her family. Paula Dennard and Buddy Rupe were the descendants of RIC's founder, and Ritchie is the descendant of one of its early owners. Three different family trusts collectively owned approximately 72% of RIC's voting stock.[2] Dennard, Ritchie, and Lutes served as trustees of those trusts and thus collectively controlled a majority of RIC's voting power. Ritchie and his family also owned an additional 10% of the shares directly, increasing the combined voting power to 82%. Buddy owned the remaining 18% directly. There was no shareholders' agreement.

---

[1] A corporation is "closely held" if it has fewer than thirty-five shareholders and its stock is not publicly traded. *See* TEX. BUS. ORGS. CODE § 21.563.

[2] Since the filing of this suit, one of the trusts, known as Ruby's Trust, has been terminated and its shares distributed amongst Dennard's three children and her step-sister, Robin Rupe.

2

Ann Rupe joined the family when she married Buddy in 1983. Rupe was Buddy's second wife, and their marriage and the birth of their son, Guy, took place after the death of Dennard and Buddy's father, Gordon. Gordon's will created Gordon's Trust, which named Gordon's wife, his children (Dennard and Buddy), and Dennard's three children as beneficiaries. Buddy and Rupe wanted their son to be added as a beneficiary of Gordon's Trust, but Dennard and her children refused, and this created some friction between Rupe and Dennard. According to Rupe, Dennard treated Rupe "as an outsider" from the very beginning, and told her that she would "never get any money in this family." With Buddy's encouragement, Rupe began considering a lawsuit to reform Gordon's Trust to add Guy as a beneficiary.

Buddy died in 2002. His 18% interest in RIC had been placed in a trust for the benefit of Rupe and their son (Buddy's Trust), naming Rupe as trustee.[3] In Rupe's view, Dennard, Ritchie, and Lutes immediately became "hostile" towards her and feared that she would sue to reform Gordon's Trust. At one point, Ritchie, with Dennard's and Lutes's approval, offered to appoint Rupe to replace Buddy on RIC's board of directors, but only if she would agree not to file suit against Gordon's Trust. Rupe declined, and instead asked Ritchie if RIC would be interested in buying out her shares. Ritchie replied that RIC could not at that time because one of RIC's subsidiaries, Hutton Communications, was going through a financial crisis. Soon thereafter, Rupe's attorney sent a letter

---

[3] Rupe brought this lawsuit in her capacity as trustee for Buddy's Trust, the actual owner of the 18% voting shares in RIC. We will generally refer to Rupe and to "Rupe's shares," however, meaning Rupe in her trustee capacity and the shares owned by Buddy's Trust.

to Lutes, requesting the opportunity to review and copy RIC's corporate documents[4] and directing the Rupe and Ritchie family members not to communicate directly with Rupe regarding RIC or any other business matters.

On behalf of RIC, Lutes later offered to redeem Rupe's shares for $1 million. With this offer, he told Rupe that "any further discussions regarding a possible stock redemption would be pointless until the Hutton Communications situation is finally resolved," and he encouraged Rupe not to redeem the shares until they "ultimately" increased in value. Rupe's attorney declined the redemption offer. Because RIC's sales exceeded $150 million and it had assets in excess of $50 million, he considered it "absurd" and an attempt "to take advantage of [Rupe]."

Rupe subsequently terminated her relationship with her attorney and personally requested a new redemption offer from Ritchie. Ritchie reiterated that he did not recommend selling her shares at that time, but he agreed to raise the issue at an upcoming board meeting. After the board meeting, Ritchie made a new offer of $1,760,947, which he said was based on a formula that RIC had previously used to value RIC's shares and, in any event, was "the highest cash offer that RIC directors believed they could make without jeopardizing the company and its other shareholders." Rupe declined the offer and decided to try to sell her shares to an outside party. She hired a new attorney and a broker, George Stasen, to market her shares. At Rupe's request, Dennard and Ritchie

---

[4] Either personally or through her various attorneys, Rupe requested RIC documents on several occasions. The record indicates that RIC repeatedly provided some documents or access in response to these requests. Nevertheless, in correspondence and at trial, Rupe's attorneys contended that RIC was not as forthcoming with its corporate books and records as their fiduciary duties and the Texas Business Organizations Code require. The jury agreed, but the court of appeals determined that the evidence was legally insufficient to support this finding, and Rupe has not challenged that holding in this Court. *See* 339 S.W.3d 275, 304–05. We therefore omit these details, and our judgment preserves the court of appeals' unchallenged holding on this issue.

met with Stasen in March 2005. The meeting did not go well. Stasen, who described the meeting as "hostile," informed Dennard and Ritchie that he felt RIC's financial performance was "very, very unsatisfactory" and accused them of mismanagement. Stasen admitted at trial, however, that he had only a limited understanding of the company at the time. Nevertheless, throughout late 2005, Ritchie and Lutes worked with Stasen and Rupe's latest attorney to draft confidentiality agreements to allow Stasen to disclose some of RIC's confidential business information to Rupe's prospective outside purchasers.

In January 2006, Rupe sent a note to Ritchie, asking for dates when he could meet with prospective purchasers. After conferring with Lutes and an outside attorney with expertise in securities law, Ritchie sent a reply to Rupe declining to participate in such meetings. Ritchie stated that, because RIC would not be a party to the sale of her shares to an outside buyer, "it would be inappropriate for me or any other officer or director of [RIC] to meet with your prospects or otherwise participate in any activities relating to your proposed sale of stock." Stasen prepared marketing materials and provided them to potential buyers, but he did not succeed in selling the stock because, in his opinion, "everybody wanted to be able to meet Lee Ritchie and talk to the executives . . . as part of their due diligence." Although he determined that the book value of Rupe's stock was $3.9 million, he discounted that to $3.4 million because of the directors' refusal to meet with prospective buyers. In his view, however, it would be "incredibly difficult" to market Rupe's shares without such meetings, and the likelihood of selling the shares was "zero."

In July 2006, Rupe filed this suit against Dennard, Ritchie, Lutes, and RIC,[5] alleging that they engaged in "oppressive" conduct and breached fiduciary duties to her. Rupe requested an accounting and valuation and an order requiring RIC to purchase her shares at fair market value or, alternatively, appointing a receiver to liquidate RIC. The jury found in Rupe's favor on essentially all of her claims and found that the fair value of Rupe's stock was $7.3 million. The trial court rendered judgment on the jury's verdict, concluding that Dennard, Ritchie, Lutes, and RIC had "engaged in oppressive conduct to the rights of [Buddy's Trust] that is likely to continue in the future," that "the most equitable remedy" for this oppression was to require RIC to redeem Rupe's shares, and that this remedy was "less drastic" than liquidating the company or appointing a receiver. Based on these conclusions and the jury's findings, the trial court ordered RIC to purchase Rupe's shares for $7.3 million. Dennard, Ritchie, Lutes, and RIC appealed.

The court of appeals held that their refusal to meet with Rupe's prospective purchasers constituted oppressive conduct as a matter of law. Having reached that conclusion, it did not consider whether other actions by Dennard, Ritchie, and Lutes were oppressive, as Rupe had alleged. The court upheld the trial court's order requiring RIC to purchase Rupe's shares, but concluded that the trial court had erred by instructing the jury not to discount the shares' value to account for their lack of marketability and control. 339 S.W.3d 275, 301–02. The court thus affirmed the finding of oppressive conduct but reversed as to the $7.3 million purchase price, and remanded the case to the

---

[5] Rupe originally sued Dennard, Ritchie, and Lutes in their individual capacities, but later added them in their capacities as RIC directors and as trustees of the trusts that owned RIC's shares.

trial court for a new determination of the shares' fair value. Dennard, Ritchie, and Lutes petitioned this Court for review, which we granted.

## II.
### Oppressive Actions Under the Receivership Statute

We begin by determining the meaning of "oppressive" as the Legislature used that word in the Texas receivership statute. This statute, former article 7.05 of the Texas Business Corporations Act, and its successor, section 11.404 of the Texas Business Organizations Code, authorize Texas courts to appoint a receiver to rehabilitate a domestic corporation under certain circumstances.[6] *See* TEX. BUS. ORGS. CODE § 11.404. Although Rupe sought appointment of a receiver to liquidate RIC rather than rehabilitate it,[7] only sought that remedy as an alternative to other remedies, did not obtain that relief in the judgment, and does not request that relief on appeal, she relies on this statute as authority for the trial court's judgment ordering RIC to buy out her shares.

Former article 7.05 authorizes courts to appoint a rehabilitative receiver when it is "necessary" to do so "to conserve the assets and business of the corporation and to avoid damage to parties at interest," but only if "all other requirements of law are complied with" and "all other

_____

[6] *See* Act of Mar. 30, 1955, 54th Leg., R.S., ch. 64, art. 7.05, 1955 Tex. Gen. Laws 239, 290–91, *amended by* Act of May 3, 1961, 57th Leg., R.S., ch. 169, 1, 1961 Tex. Gen. Laws, 319, 319 (formerly TEX. BUS. CORP. ACT art. 7.05), *expired Jan. 1, 2010*, Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 2, 2003 Tex. Gen. Laws 267 (current version at TEX. BUS. ORGS. CODE § 11.404) [herein, former article 7.05]. The Business Corporations Act, now expired, was in large part recodified in the Texas Business Organizations Code. *See* Act of May 13, 2003, 82nd Leg., R.S., ch. 182, § 1, 2003 Tex. Gen. Laws 267. Although section 11.404 governs current actions for rehabilitative receivership, former article 7.05 was the governing statute when the trial court rendered its judgment in this case. *See* TEX. BUS. ORGS. CODE § 402.001–.005. The language of the two statutes is not identical, but for purposes of this case their differences are not material.

[7] Former article 7.05 and current Section 11.404 only authorize the appointment of a receiver to rehabilitate a corporation. Under other circumstances, different sections of the statutes authorize courts to appoint a receiver to liquidate a corporation's property and business. *See* TEX. BUS. ORGS. CODE §§ 11.402, 11.405; former TEX. BUS. CORP. ACT art. 7.06.

remedies available either at law or in equity, including the appointment of a receiver for specific

assets of the corporation, are determined by the court to be inadequate." Former art. 7.05(A); *see also*

TEX. BUS. ORGS. CODE § 11.404(b). In addition, when the party seeking a receivership is a

shareholder of the corporation, the party must also establish:

> (a) that the corporation is insolvent or in imminent danger of insolvency; or
>
> (b) that the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock, and that irreparable injury to the corporation is being suffered or is threatened by reason thereof; or
>
> (c) *that the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent*; or
>
> (d) that the corporate assets are being misapplied or wasted; or
>
> (e) that the shareholders are deadlocked in voting power, and have failed, for a period which includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired or would have expired upon the election and qualification of their successors.

Former art. 7.05(A)(1) (emphasis added); *see also* TEX. BUS. ORGS. CODE § 11.404(a)(1). Rupe

relies on subpart (c), and asserts that Dennard's, Ritchie's, and Lutes's actions were "oppressive."

Thus, we must determine what the Legislature meant when it used the term "oppressive" in this

statute, whether the refusal to meet with Rupe's potential buyers fits within that meaning, and what

remedies the statute provides for such actions.

**A. Cases Construing "Oppressive"**

   This Court has not previously construed former article 7.05 or current section 11.404.

Initially, Texas courts of appeals construed the statute quite narrowly. In *Texarkana College Bowl,*

*Inc. v. Phillips*, the court reversed a trial court order appointing a receiver based on oppressive actions, holding that a "stockholder's dissatisfaction with corporate management is not by [former] Article 7.05 made grounds for a receivership," and the shareholder was not entitled to a receivership based on acts that were "not inconsistent with the honest exercise of business judgment and discretion by the board of directors." 408 S.W.2d 537, 539 (Tex. Civ. App.—Texarkana 1966, no writ). The court thus incorporated the concept of the "business judgment rule" into its analysis of whether actions were oppressive under the statute. *See id.*; *see also In re Schmitz*, 285 S.W.3d 451, 457, 457 n.33 (Tex. 2009) (addressing the "business judgment that Texas law requires a board of directors to exercise").

Twenty-two years later, another court of appeals affirmed a trial court's denial of a petition for appointment of a receiver, holding that, in light of the statute's requirement that "'all other remedies available either at law or in equity' are inadequate," the trial court "properly required an emergency on which to base the relief sought." *Balias v. Balias*, 748 S.W.2d 253, 257 (Tex. App.—Houston [14th Dist.] 1988, writ denied). Both *Phillips* and *Balias* involved closely held corporations like RIC, but neither court held that such corporations were entitled to any special treatment under the receivership statute, which does not distinguish between closely held and other types of corporations.[8] *See id.*; *Phillips*, 408 S.W.2d at 539.

_____

[8] Closely held corporations have unique attributes that may justify different protections under the law. We discuss these considerations in Section III, *infra,* in our analysis of whether to recognize a common-law cause of action for oppression. We do not discuss them here because former article 7.05 and section 11.404 apply equally to all corporate forms, whether closely held or publicly traded, without distinction.

That same year, another court of appeals became the first Texas appellate court to affirm a judgment based on the statute's oppressive-actions provision. *Davis v. Sheerin*, 754 S.W.2d 375 (Tex. App.—Houston [1st Dist.] 1988, writ denied). In *Davis*, which has since become the seminal Texas opinion on the issue, a 45% owner of a closely held corporation, Sheerin, sued the company's president and 55% owner, Davis, alleging that Davis engaged in oppressive conduct and breached fiduciary duties owed to Sheerin and the company. *Id.* at 377. The jury agreed with Sheerin, and the trial court appointed a rehabilitative receiver and ordered Davis to buy out Sheerin's interest. *Id.* at 378. Although the court of appeals acknowledged that the statute does not expressly authorize a buy-out order and that no Texas court had previously forced a shareholder buyout in the absence of a buy-out agreement, *id.* at 378–79, it concluded that "Texas courts, under their general equity power, may decree a [buyout] in an appropriate case where less harsh remedies are inadequate to protect the rights of the parties." *Id.* at 380.

When determining what constitutes "oppressive" action under the statute, the *Davis* court concluded that "[c]ourts take an especially broad view of the application of oppressive conduct to a closely-held corporation, where oppression may more easily be found," *id.* at 381, and then recited two standards for oppression:

- a New York court's definition of oppression as occurring "when the majority's conduct substantially defeats the expectations that objectively viewed were both reasonable under the circumstances and were central to the minority shareholder's decision to join the venture," and

- an Oregon court's collection of oppression definitions, which included "'burdensome, harsh and wrongful conduct,' 'a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members,' or 'a visible departure

10

from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely.'"

*Id.* at 381–82. These two standards—generally referred to as the "reasonable expectations" test and the "fair dealing" test—have since echoed throughout Texas oppressive-actions cases.[9]

In the present case, the trial court used the fair dealing test to define "oppressive" for the jury. On appeal, the court of appeals concluded that the directors' refusal to meet with Rupe's potential purchasers was oppressive under both tests: it substantially defeated Rupe's reasonable expectations and constituted a "visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely." 339 S.W.3d at 297. In addition, the court rejected the application of the business judgment rule, reasoning that the rule applies only in derivative suits and only to protect directors from individual liability. *Id.* at 295–96. The court thus affirmed the trial court's finding that Dennard, Ritchie, and Lutes had engaged in oppressive conduct. *Id.* at 309.

## B.    The Meaning of "Oppressive" Under the Receivership Statute

The construction of former article 7.05, like any other statute, is a question of law for the courts, and we review the court of appeal's determination of this question de novo. *Atmos Energy Corp. v. Cities of Allen*, 353 S.W.3d 156, 160 (Tex. 2011). "Our task is to effectuate the Legislature's expressed intent," *In re Allen*, 366 S.W.3d 696, 703 (Tex. 2012); it is not to impose our personal policy choices or "to second-guess the policy choices that inform our statutes or to

---

[9] *See, e.g.*, *Kohannim v. Katoli*, No. 08-11-00155-CV, 2013 WL 3943078, at *9–11, — S.W.3d —, — (Tex. App.—El Paso July 24, 2013, pet. denied); *Boehringer v. Konkel*, 404 S.W.3d 18, 24 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Redmon v. Griffith*, 202 S.W.3d 225, 234 (Tex. App.—Tyler 2006, pet. denied); *Cotton v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 699–701 (Tex. App.—Fort Worth 2006, pet. denied); *Pinnacle Data Servs., Inc. v. Gillen,* 104 S.W.3d 188, 196 (Tex. App.—Texarkana 2003, no pet.); *Willis v. Bydalek*, 997 S.W.2d 798, 801 (Tex. App.—Houston [1st Dist.] 1999, pet. denied).

weigh the effectiveness of their results." *Iliff v. Iliff*, 339 S.W.3d 74, 79 (Tex. 2011) (quoting *McIntyre v. Ramirez*, 109 S.W.3d 741, 748 (Tex. 2003)). We focus on the words of the statute, because "[l]egislative intent is best revealed in legislative language." *In re Office of Att'y Gen.*, 422 S.W.3d 623, 629 (Tex. 2013).

We begin by noting that the Legislature has never defined the term "oppressive" in the Business Corporations Act or the Business Organizations Code. And although it has used the terms "oppress," "oppressive," or "oppression" in a handful of other Texas statutes, they do not include a definition either.[10] In the absence of a statutory definition, we give words their common meaning. *City of Dall. v. Abbott*, 304 S.W.3d 380, 393 (Tex. 2010). Dictionary definitions of "oppression" include "[t]he act or an instance of unjustly exercising authority or power," "[c]oercion to enter into an illegal contract," and—reflective of case law addressing claims like Rupe's claim in this case—"[u]nfair treatment of minority shareholders (esp. in a close corporation) by the directors or those in control of the corporation." BLACK'S LAW DICTIONARY 1203 (9th ed. 2009). As these definitions and the Legislature's other uses of the term demonstrate, "oppressive" is a broad term that can mean different things in different contexts. Under the other statutes, a government

---

[10] *See, e.g.*, TEX. BUS & COM. CODE § 2.614 (providing that payment in the manner required by a government regulation is sufficient to discharge a buyer's obligation "unless the regulation is discriminatory, oppressive or predatory."); *Id*. § 2A.404 (same for lease payments); TEX. CIV. PRAC. & REM. CODE § 22.024(2) (court may compel journalist to testify if, *inter alia*, "the subpoena is not overbroad, unreasonable, or oppressive"); TEX. CODE OF CRIM. PROC. art. 38.11 Sec. 5(b)(1) (subpoena may not be "overbroad, unreasonable, or oppressive"); *Id*. art. 17.15 ("The power to require bail is not to be so used as to make it an instrument of oppression."); TEX. FIN. CODE § 392.302(1) (listing conduct by which a debt collector "may not oppress, harass, or abuse a person"); TEX. GOV'T CODE § 432.138 (prohibiting military officers from "cruelty toward, or oppression or maltreatment of, any person subject to his order"); *Id*. § 665.052(4) (public officers may be removed for "oppression in office"); TEX. OCC. CODE § 2301.455 (auto dealer's franchise agreement may be terminated considering, *inter alia*, "oppression, adhesion, and the parties' relative bargaining power"); TEX. PENAL CODE § 1.02 (objective of Penal Code is to prevent "arbitrary or oppressive treatment of persons suspected, accused, or convicted"); *Id*. § 39.03 (defining "official oppression" as "intentionally" inflicting various harm on others).

12

regulation, a subpoena, the amount of bail, the use of military or official authority, a franchise agreement, and a debt collector's actions can all be "oppressive."[11] Generally, these statutes indicate that "oppressive" actions involve an abuse of power that harms the rights or interests of another person or persons and disserves the purpose for which the power is authorized. But the test for determining whether something is oppressive will necessarily vary from one context to the next, and thus the term has multiple meanings, depending on the circumstances.

"[W]hen an undefined [statutory] term has multiple common meanings, the definition most consistent within the context of the statute's scheme applies." *State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180–81 (Tex. 2013) (per curiam). To determine the meaning of "oppressive" in the receivership statute, our text-based approach to statutory construction requires us to study the language of the specific provision at issue, within the context of the statute as a whole, endeavoring to give effect to every word, clause, and sentence. *In re Office of Att'y Gen.*, 422 S.W.3d at 629; *Fitzgerald v. Advanced Spine Fixation Sys.*, 996 S.W.2d 864, 866 (Tex. 1999). We therefore examine not only the language of the oppression provision but also the language and context of the entire receivership statute, including the other specific grounds on which it authorizes a receivership and the general requirements that apply to all of the specific grounds.

## 1. General Requirements for Receivership

The term "oppressive" in former article 7.05 occurs within a statute that authorizes courts to appoint a receiver to take over a corporation's governance, displacing those who are otherwise legally empowered to manage the corporation. Within this context, two aspects of this receivership

---

[11] *See* authorities cited *supra* note 10.

statute are particularly relevant. First, both former article 7.05 and current section 11.404 are not limited to closely held corporations. *See* former art. 7.05; Tex. Bus. Orgs. Code § 11.404. The Legislature has adopted a single standard for rehabilitative receivership based on oppressive actions that applies to all corporations (and, under the current statute, any "domestic entity") without regard to the number of its shareholders or the marketability of its shares. *See id.* Nothing in the language suggests that this statute provides a special right or remedy unique to minority shareholders in closely held corporations. *See id.* We must thus construe the statute in a manner that is meaningful and workable not only for the peculiarities of minority shareholders in a closely held corporation, but also for shareholders and owners of other business entities.

Second, the statute places significant restrictions on the availability of a receivership: (1) the receivership must be "necessary . . . to conserve the assets and business of the corporation and to avoid damage to parties at interest," (2) "all other requirements of law [must be] complied with," and (3) "all other remedies available either at law or in equity" must be "inadequate." Former art. 7.05(A) (emphasis added); *see also* Tex. Bus. Orgs. Code § 11.404(b). These requirements demonstrate the Legislature's intent that receivership—which replaces the managers the shareholders chose with the courts' chosen managers—is a "harsh" remedy that is not readily available. *See Balias*, 748 S.W.2d at 257. In fact, by requiring termination of the receivership immediately after the condition that necessitated the receiver is remedied, the Legislature has expressed its intent that receivership be a temporary fix for exigent circumstances. *See* former art. 7.05(B); *see also* Tex. Bus. Orgs. Code § 11.404(c). We thus agree with the *Balias* court that, to qualify as the type of "oppressive" actions

14

that justify a rehabilitative receivership, the complained-of actions must create exigent circumstances for the corporation. *See Balias*, 748 S.W.2d at 257.

### 2. Other Grounds for Receivership

In addition to the statute's three general requirements, a shareholder who seeks a rehabilitative receivership under former article 7.05 must also prove at least one of five specific grounds, one of which is the "illegal, oppressive or fraudulent" actions provision on which Rupe relies. *See* former art. 7.05(A)(1)(c); *see also* TEX. BUS. ORGS. CODE § 11.404(a)(1)(C). The other four specific grounds are (1) the corporation is insolvent or in imminent danger of becoming insolvent; (2) an unbreakable deadlock among the corporation's managers is causing or threatening irreparable injury to the corporation; (3) a deadlock among the shareholders prevents the election of the corporation's management; or (4) the corporation's assets are being misapplied or wasted. Former art. 7.05(A)(1)(a), (b), (d), (e); *see also* TEX. BUS. ORGS. CODE § 11.404(a)(1)(A), (B), (D), (E). These are all situations that pose a serious threat to the well-being of the corporation. We must construe "illegal, oppressive, or fraudulent" actions, when alleged as a ground for receivership, in a manner consistent with these types of situations. *See, e.g.*, *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 629 (Tex. 2011) (construing "public interest" to reference only public interest in natural resources, not public interest in traffic safety, when other considerations identified in statute exclusively concerned matters relating to oil and gas).

### 3. "Illegal, Oppressive, or Fraudulent" Actions

Finally, we consider the statute's specific provision, which requires a finding that the "directors or those in control of the corporation" engaged in "illegal, oppressive, or fraudulent"

15

actions. This requirement provides two more essential pieces of guidance. First, receivership under this provision must be based on the actions of the corporation's "directors or those in control of the corporation." *See* former art. 7.05(A)(1)(c); *see also* TEX. BUS. ORGS. CODE § 11.404(a)(1)(C) ("governing persons").[12] Directors, or those acting as directors, owe a fiduciary duty to the corporation in their directorial actions, and this duty "includes the dedication of [their] uncorrupted business judgment for the sole benefit of the corporation." *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963); *see also Gearhart Indus., Inc. v. Smith Intern., Inc.*, 741 F.2d 707, 723–24 (5th Cir. 1984) (describing corporate director's fiduciary duties of obedience, loyalty, and due care). Since the statute permits a receivership only for the "oppressive" actions of those who are duty-bound to act according to their "uncorrupted business judgment for the sole benefit of the corporation," the meaning of "oppressive" must accommodate the exercise of that business judgment. In other words, because a director is duty-bound to exercise business judgment for the sole benefit of the corporation, and not for the benefit of individual shareholders, we cannot construe the term "oppressive" in a manner that ignores that duty. *See, e.g.*, *Holloway*, 368 S.W.2d at 577–78 (describing corporate officers' and directors' duty to maximize corporate returns and value of

---

[12] Ordinarily, a corporation must be managed by a board of directors. TEX. BUS. ORGS. CODE § 21.401(a). The Business Organizations Code allows certain exceptions, including when the shareholders' agreement or the governing documents of a "close corporation" provide for the elimination of the board of directors in favor or one or more corporate managers. *Id.* §§ 21.101(a)(2), 21.713(2). Under these circumstances, corporations may be managed directly by shareholders. *See id.* §§ 21.101(a)(2), 21.714(b)(1), (2). Thus, former article 7.05 and current section 11.404 authorize receivership based on the conduct of a corporation's directors (when the corporation is managed by a board of directors) or of its shareholders (when the corporation is managed by its shareholders). *See* former art. 7.05(A)(1)(c); TEX. BUS. ORGS. CODE § 11.404(a)(1)(C). In either instance, however, the persons or entities managing the corporation act in the capacity of directors and are treated as directors under the Code. TEX. BUS. ORGS. CODE §§ 21.106(a)–(b), 21.725–.726(a); *see also id.* § 21.727 (managing shareholders subject to liability imposed on directors for management-related conduct required by law).

corporation's shares); *Hughes v. Hous. NW. Med. Ctr., Inc.*, 680 S.W.2d 838, 843 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) (observing that corporate officers and directors owe corporation and its collective shareholders "a duty to act only in their best interest"). We therefore reject the court of appeals' conclusion that the business judgment rule "has no application in this case." 339 S.W.3d at 296. Instead, we agree with the *Texarkana College Bowl* court's conclusion that conduct is oppressive only if it is "inconsistent with the honest exercise of business judgment and discretion by the board of directors."[13] *Texarkana Coll. Bowl*, 408 S.W.2d at 539; *see also Willis*, 997 S.W.2d at 802–03.

Second, the Legislature grouped together three categories of conduct in this provision of the statute—actions that are "illegal," actions that are "fraudulent," and actions that are "oppressive." *See* former art. 7.05(A)(1)(c); *see also* TEX. BUS. ORGS. CODE § 11.404(a)(1)(C). It is a "familiar principle of statutory construction that words grouped in a list should be given related meaning," *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 174 n.2 (Tex. 1980), and similarly that "the meaning of particular words in a statute may be ascertained by reference to other words associated with them in the same statute." *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003). Thus, the meaning that the Legislature contemplated for the term "oppressive" must be consistent with,

---

[13] The dissent states that "the business judgment rule is fundamentally at odds with shareholder oppression remedies." *Post* at __. But our task is not to construe the receivership statute in a manner that is consistent with "shareholder oppression remedies," a phrase that cannot be found in any prior Texas opinion. Our task is to construe the statute in a manner that is consistent with statutory language enacted by the Legislature. The business judgment rule is entirely consistent with the language of the statute, which authorizes relief only if necessary "to conserve the property and business of the domestic entity and avoid damage to interested parties," and it is entirely consistent with the surrounding grounds for relief under the statute, which focus on insolvency, deadlock in the management of the business, and misuse of business property—i.e., conduct that threatens the interests of the business. *See* former art. 7.05(A)(1)(a), (b), (d), (e); TEX. BUS. ORGS. CODE § 11.404(a)(1)(A), (B), (D), (E).

17

though not identical to, the meanings intended for the accompanying terms "illegal" and "fraudulent."

Illegal and fraudulent actions in corporate management share considerable similarities and in some circumstances overlap—fraud generally is itself "illegal," and may subject the actor to criminal liability. *See, e.g.*, TEX. PENAL CODE, ch. 32 (fraud), ch. 35 (insurance fraud), ch. 37 (perjury and other falsification). Fraudulent and illegal actions in this context pose a danger to the corporation itself. Fraudulent or illegal actions by a corporation's directors may result in disregard of the corporate form, *see, e.g.*, TEX. BUS. ORGS. CODE § 21.223(b); may vitiate the corporation's contractual interests, *see Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997); and may even result in an involuntary judicial termination of the corporation, *see* TEX. BUS. ORGS. CODE § 11.301(a)(2), (5). We must construe the third of these terms – "oppressive"—in a manner consistent with the severity of these concepts.

### 4. The Meaning of "Oppressive"

Considering the language and context of the statute, we have identified at least three characteristics of "actions" that the statute refers to as "oppressive": (1) the actions justify the harsh, temporary remedy of a rehabilitative receivership; (2) the actions are severe and create exigent circumstances; and (3) the actions are inconsistent with the directors' duty to exercise their honest business judgment for the benefit of the corporation. The term's common meaning and its usage in other statutes add a fourth characteristic: the actions involve an unjust exercise or abuse of power that harms the rights or interests of persons subject to the actor's authority and disserves the purpose

18

for which the power is authorized.[14] Actions that uniformly affect all shareholders typically will not satisfy this aspect of the term's meaning because, collectively, the shareholders of a business are not at the mercy of the business's directors.[15]

In light of these considerations, we conclude that neither the "fair dealing" test nor the "reasonable expectations" test sufficiently captures the Legislature's intended meaning of "oppressive" actions in former article 7.05.[16] As to the "fair dealing" test, we agree that a "lack of probity and fair dealing" and "a visible departure from the standards of fair dealing and [a] violation of fair play" may be aspects of actions that are "oppressive," and we agree that the actions must be "burdensome, harsh and wrongful." And as to the "reasonable expectations" test, we agree that oppressive actions will defeat the reasonable expectations that were central to the shareholder's decision to join the venture. But in light of the language and context of the statute and the term's

---

[14] *See* authorities cited *supra* note 10; *see also* TEX. CONST. art. XV, § 8 (providing for removal of judges for oppression in office); TEX. PENAL CODE § 39.03 (oppression by a public official); *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 103 (Tex. 2011) (Jefferson, C.J., joined by JJ. Wainwright and Lehrmann, concurring) (observing duty of courts and legislature to protect litigants from "crippling burdens oppressive discovery imposes"); *State v. Coca Cola Bottling Co. of Sw.*, 697 S.W.2d 677, 679 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) (observing that state antitrust statutes are designed to "suppress trusts, secure the benefits arising from competition in trade, prevent monopolies, and protect the people from the possible tyranny and oppression of combined wealth") (citing *Monopolies, Etc.* 54 Am. Jur. 2d § 452 (1971)).

[15] Thus, actions that are "oppressive" under the statute ordinarily will not give rise to derivative suits. In other words, shareholders may not use a claim under the oppression provision of the receivership statute as an end-run around the Legislature's detailed rules and procedures for derivative actions.

[16] The dissent contends that the "Legislature has acquiesced" in "the long-standing definition of oppression that has existed at the common-law in Texas and a host of other jurisdictions," *post* at __, the development of which it attributes primarily to New York courts, *post* at __. With respect to the first contention, we note that this Court has consistently refused to rely on "legislative acquiescence" as a doctrine of statutory construction when it runs contrary to the plain language of the statute. *See, e.g.*, *Pretzer v. Motor Vehicle Bd.*, 138 S.W.3d 908, 914–15 (Tex. 2004) (rejecting argument based on legislative acquiescence because "neither legislative ratification nor judicial deference to an administrative interpretation can work a contradiction of plain statutory language."). With respect to the second, we have discussed above the meaningful differences between New York's statute relating to oppressive conduct, which applies only to closely held corporations, and Texas's statute, which applies to all domestic business entities.

common meaning and other uses, we cannot accept a definition that would find oppression on either of these bases alone, and we disapprove of the court of appeals decisions that have.[17]

Considering all of the indicators of the Legislature's intent, we conclude that a corporation's directors or managers engage in "oppressive" actions under former article 7.05 and section 11.404 when they abuse their authority over the corporation with the intent to harm the interests of one or more of the shareholders, in a manner that does not comport with the honest exercise of their business judgment, and by doing so create a serious risk of harm to the corporation.

### 5.      Application to Rupe

Applying the Legislature's intended meaning, we conclude that the refusal by Dennard, Ritchie, and Lutes to meet with Rupe's potential buyers does not constitute an "oppressive" action for which Rupe may obtain relief under former article 7.05. Dennard, Ritchie, and Lutes had no contractual, statutory, or other duty to meet with prospective buyers. Rupe does not dispute that they sought and received the advice of an outside attorney who had expertise in securities law before making that decision, and they declined to participate in the meetings because doing so would increase the risk of suit against RIC and its directors in the event of a dissatisfied purchaser.[18] Moreover, the evidence does not support a finding that they abused their authority with the intent

---

[17] *See, e.g.*, *Kohannim v. Katoli*, 2013 WL 3943078 at *9–11, — S.W.3d at —; *Boehringer*, 404 S.W.3d at 24; *Redmon*, 202 S.W.3d at 234; *Cotton*, 187 S.W.3d at 699–701; *Pinnacle Data*, 104 S.W.3d at 196; *Willis*, 997 S.W.2d at 801; *Davis*, 754 S.W.2d at 382.

[18] As several amici noted in their briefs to this Court, by providing information to Rupe's prospective purchasers the directors would have placed RIC and themselves at risk of liability for making misleading "statements" under state and federal securities laws. *See* TEX. REV. CIV. STAT. art. 581-33(A) (imposing liability for misrepresentation or omissions of material facts by one who offers or sells a security); 17 C.F.R. § 240.10b-5 (imposing similar liability under federal law).

to harm Rupe's interests in RIC, or that their decision created a serious risk of harm to RIC. In the absence of such evidence, we conclude that their refusal to meet with prospective buyers was not "oppressive" as that term is used in the receivership statute.

Undoubtedly, the directors' refusal to meet with prospective purchasers placed Rupe in a difficult situation that prevented her from selling her shares as quickly as she wanted and for their full value. But difficulty in—and sometimes even the impossibility of—selling one's shares is a characteristic intrinsic to ownership of a closely held corporation, the shares of which are not publicly traded. Shareholders of closely held corporations may address and resolve such difficulties by entering into shareholder agreements that contain buy-sell, first refusal, or redemption provisions that reflect their mutual expectations and agreements. In the absence of such agreements, however, former article 7.05 authorizes the appointment of a receiver only for specific conduct—in this case, allegedly oppressive actions—and the conduct relied on by the court of appeals here does not meet that standard.[19]

## C.    Statutory Remedy

Although the court of appeals relied exclusively on the directors' decision not to meet with potential buyers of Rupe's shares, Rupe asserted that other actions by Dennard, Ritchie, and Lutes also constituted "oppressive" conduct under former article 7.05. We need not consider whether any or all of these other actions were oppressive, however, because we hold that, even if they were, the

---

[19] Because this is the first time this Court has addressed the meaning of the term "oppressive" in the receivership statute, we would ordinarily consider remanding the case for a new trial under the new legal standard that we have announced. *See, e.g.*, *Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 162 (Tex. 2013) (remanding case in the interest of justice for new trial under newly announced legal standard). In light of our next holding that the statute does not authorize courts to grant the relief that Rupe obtained, however, we need not consider that option here.

statute does not authorize the buy-out remedy that Rupe sought and obtained, and Rupe did not request the rehabilitative-receivership remedy that the statute does authorize.[20]

Former article 7.05 creates a single cause of action with a single remedy: an action for appointment of a rehabilitative receiver. *See* former art. 7.05; *see also* TEX. BUS. ORGS. CODE § 11.404. It identifies:

- to whom the cause of action is available: shareholders and creditors;[21]

- the remedy available: "[a] receiver may be appointed for the assets and business of a corporation."[22]

- the grounds on which each type of claimant may seek the remedy;[23] and

- the requirements a claimant must satisfy to obtain the remedy:

  - the appointment of a receiver must be necessary "to conserve the assets and business of the corporation and to avoid damage to parties at interest,"

  - "all other requirements of law are complied with," and

  - "all other remedies available either at law or in equity . . . are determined by the court to be inadequate."[24]

---

[20] Rupe requested appointment of a receiver as an alternative remedy in the trial court. But she only sought a liquidating receiver, not a rehabilitative receiver. A liquidating receiver is available under former article 7.06, but not 7.05. *See Mueller v. Beamalloy, Inc.*, 994 S.W.2d 855, 860–61 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (distinguishing rehabilitative receivership of article 7.05 from liquidating receivership of article 7.06). Oppressive actions are not a ground for appointment of a liquidating receiver under 7.06, and Rupe did not submit the elements necessary for a liquidating receiver to the jury.

[21] Former art. 7.05(A)(1), (2) (shareholder or creditor); *see* TEX. BUS. ORGS. CODE § 11.404(a)(1), (2).

[22] Former art. 7.05(A); *see* TEX. BUS. ORGS. CODE § 11.404(b)(1)–(3).

[23] Former art. 7.05(A)(1)(a)–(e) (grounds for shareholder), (A)(2)(a)–(b) (grounds for creditor); *see* TEX. BUS. ORGS. CODE § 11.404(a)(1)(A)–(E), (2)(A)–(B).

[24] Former art. 7.05(A); *see* TEX. BUS. ORGS. CODE § 11.404(b)(1)–(3).

22

The court of appeals relied on the statute's third requirement—a finding that all other remedies available at law or in equity are inadequate—to hold that the statute authorizes not only the appointment of a receiver but also any other appropriate equitable relief. 339 S.W.3d at 286. We disagree. Subsection (A) of former article 7.05, like subsection (b) of current section 11.404, identifies the inadequacy of other legal and equitable remedies as a prerequisite to the appointment of a receiver. *See* former art. 7.05(A); Tex. Bus. Orgs. Code § 11.404(b). This provision is a restriction on the availability of receivership, not an expansion of the remedies that the statute authorizes.[25] It is consistent with the extraordinary nature of receivership and is a common

[25] The dissent reaches a contrary conclusion based, in part, on broad assertions about the holdings of courts in other jurisdictions, and suggests that our holdings in this case contradict the holdings of most other states. *See, e.g.*, *post* at __. But we must construe the Texas statute, and it differs from the statutes in those other states. In particular, the dissent points to the Model Business Corporation Act, which it asserts served as the basis of the Texas receivership statute, and the Illinois statute, which it asserts served as the basis of the model act. But a comparison of the language of the Texas statute to the language of the model act and the Illinois statute only confirms our construction of the Texas statute, rather than the dissent's.

The model act, for example, does not allow for appointment of a rehabilitative receiver based on oppressive actions. *See* Model Business Corporation Act § 7.48. In fact, it does not provide for *any* consideration of an individual shareholder's interests in determining whether to appoint a receiver. *Id.* § 7.48(a) (authorizing appointment of a custodian or receiver only when a shareholder establishes that the corporation's "directors are deadlocked" and "irreparable injury to the corporation is threatened or being suffered" or that "the directors or those in control of the corporation are acting fraudulently and irreparable injury to the corporation is threatened or being suffered"). Instead, under the model act, oppressive actions will only support a claim for dissolution of the corporation, and only if it is a closely held corporation. *See id.* § 14.30(a)(2)(ii), (b). *Compare* Tex. Bus. & Com. Code § 11.404, *with* Model Business Corporation Act § 14.30(a)(2)(ii), (b); *post* at __ (stating that "36 states in all appear to allow liquidation for oppressive or similar conduct"). We thus construe the Texas statute in a manner that is consistent with the less severe but more generally available remedy it authorizes for oppressive actions.

More importantly, the model act, unlike the Texas statute, *expressly authorizes* a buy-out option as an alternative to dissolution based on oppressive actions, but only if the corporation or one or more of its shareholders elects that option. Model Business Corporation Act § 14.34(a). Because the model act expressly authorizes a buyout, we cannot rely on it to find such a remedy in the Texas statute, which does not. And even if we could, it would provide no basis to hold that courts may order a buyout against the wishes of the corporation and its remaining shareholders.

Like the model act, but unlike the Texas statute, the Illinois statute creating a remedy for oppressive actions is limited to shareholders in corporations that are not publicly traded. *Compare* 805 Ill. Comp. Stat. 5/12.55 (shareholder remedies in public corporations), *with* 805 Ill. Comp. Stat. 5/12.56 (shareholder remedies in non-public corporations). And unlike the Texas statute, the Illinois statute *expressly authorizes* a broad array of remedies, including the removal of an officer or director, the appointment of a custodian, the payment of dividends, the award of damages, and "[t]he purchase by the corporation or one or more other shareholders of all, but not less than all, of the shares of the petitioning shareholder." *Id.* § 5/12.56(b). Thus, the Illinois legislature did exactly what the Texas legislature chose not to do: it

23

prerequisite for other extraordinary forms of relief. *See, e.g.*, *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004) (mandamus is extraordinary writ available only when remedy by appeal is inadequate); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 210 (Tex. 2002) (to obtain injunction under court's equitable powers, party must prove inadequacy of all remedies available at law).

Unlike the statute, which authorizes only a receivership, common-law causes of action, particularly those that invoke a court's equitable powers, often support a variety of remedies, and the same may be true of other statutes that authorize receivership. *See, e.g.*, TEX. BUS. & COM. CODE § 24.008(a)(3) (authorizing appointment of a receiver among types of equitable relief available for fraudulent transfer). Additionally, as discussed later in this opinion, the kinds of actions that support a shareholder action for receivership under the "oppressive" prong of the statute are the kinds of conduct that also may support other causes of action, such as fraud or breach-of-fiduciary-duties to the corporation. *See* former art. 7.05(A); TEX. BUS. ORGS. CODE § 11.404(a). Finally, the statute itself contemplates other, less harsh, relief that may be available under other provisions of the statute, such as the appointment of a receiver only over specific corporate assets rather than a receivership over the whole corporation. *See* former art. 7.05(A); TEX. BUS. ORGS. CODE § 11.404(b)(3).

The statute thus recognizes that in many circumstances relief other than appointment of a receiver may be available, and it requires courts to consider such relief before appointing a

---

expressly authorized, by statute, additional remedies beyond appointment of a receiver, including judicially mandated buyouts. *See* 805 ILL. COMP. STAT. 5/12.55(b)(11). We cannot rely on another state's statute, which expressly authorizes certain remedies, as a basis for construing our statute, which does not expressly authorize those remedies, as if it does. To the contrary, the Illinois statute demonstrates how the Texas legislature could have statutorily authorized alternative remedies, but it did not.

rehabilitative receiver. *See* former art. 7.05(A); TEX. BUS. ORGS. CODE § 11.404(b)(3). If lesser

remedies[26] are available under either the common law or other statutory provisions, and those

remedies are adequate, the Court cannot appoint a rehabilitative receiver. *See id.* Here, for example,

the jury found in Rupe's favor on her breach-of-fiduciary-duty claim.[27] Before granting a

---

[26] The dissent's focus on the availability of "lesser remedies" assumes, without analysis, that the trial court's buy-out order is a "lesser remedy" than appointment of a rehabilitative receiver. But that contention is disputed in this case. Dennard, Rupe, and Lutes have argued that the trial court's buy-out order was an "unduly harsh 'remedy'" that will force RIC to sell and/or leverage corporate assets to scrape together over $7.3 million for [Ritchie's] stock," which would bring RIC "to its knees" and place it "at risk of bankruptcy." 339 S.W.3d at 298 (not analyzing this argument under the "lesser remedies" language in the statute).

　　Commentators also have recognized that court-ordered buyouts can threaten the financial security of closely held entities, even pushing them into bankruptcy or dissolution. *See, e.g.*, Lydia Rogers, *The Bankruptcy Implications of A Court-Ordered Buyout for Shareholder Oppression: Is It A Remedy at All?*, 64 BAYLOR L. REV. 594, 604 (2012) ("The reality is that a court-ordered buyout judgment could force closely held corporations to declare bankruptcy. Buyout judgments, even after discounts, can easily exceed one million dollars. Such an amount is not likely to be readily available to a closely held corporation, and after a judgment, it would be unlikely that the corporation would be able to obtain outside financing to pay the debt."); Edward B. Rock & Michael L. Wachter, *Waiting for the Omelet to Set: Match-Specific Assets and Minority Oppression in Close Corporations*, 24 J. CORP. L. 913, 920 (1999) (noting that, particularly in the context of close corporations, readily available "dissolution or buyout increase the risk of bankruptcy, thereby reducing the creditworthiness of the company"); 1 F. Hodge O'Neal & Robert B. Thompson, O'NEAL & THOMPSON'S OPPRESSION OF MINORITY SHAREHOLDERS & LLC MEMBERS §1:4, at 1-7 n.2 (rev. 2d ed. 2005) ("In discussing a minority shareholder suit which eventually led to the bankruptcy of the corporation, a Pennsylvania attorney noted: 'No responsible bank would extend credit to a close[] corporation embroiled in a shareholder controversy. Without credit, most such corporations simply die.'" (quoting Letter to author, June 15, 1981)).

[27] The dissent states, "The Court's logic in applying the business judgment rule in this context would presumably also apply to minority shareholder claims for breach of fiduciary duty." *Post* at __. We see no basis for such an assumption and note that Texas law recognizes different kinds of fiduciary duties owed under different circumstances. *See, e.g.*, *Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex. 2005) (discussing formal and informal fiduciary duties). The fiduciary duty alleged in this case is an informal fiduciary duty between Rupe and Dennard, Ritche, and Lutes. Informal fiduciary duties "arise from 'a moral, social, domestic, or purely personal relationship of trust and confidence.'" *Id.* at 331 (quoting *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998)). Informal fiduciary duties are not owed in business transactions unless the special relationship of trust and confidence existed prior to, and apart from, the transaction(s) at issue in the case. *Id.* (quoting *Associated Indem.*, 964 S.W.2d at 288). This Court has never applied the business judgment rule to informal fiduciary duties before; no party argues that we should do so in this case; and because such duties arise separate and apart from business relationships, we see no reason to assume that the rule would apply.

　　With regard to formal fiduciary duties, this Court has never recognized a formal fiduciary duty between majority and minority shareholders in a closely-held corporation, *see Willis v. Donnelly*, 199 S.W.3d 262, 276–77 (Tex. 2006), and no party has asked us to do so here. This Court has recognized a fiduciary duty owed by corporate officers and directors to the corporation, which prohibits officer and directors from usurping corporate opportunities for personal gain and requires them to exercise their "uncorrupted business judgment for the sole benefit of the corporation." *Int'l Bankers Life Ins. v. Holloway*, 368 S.W.2d 567, 576–77 (Tex. 1963); *see also Redmon*, 202 S.W.3d at 233 (noting that officers'

25

receivership under the statute, the trial court was required to determine whether Rupe was entitled to remedies for breach of fiduciary duty based on the jury verdict and if so, whether those remedies were adequate; it did neither.[28] But the statute does not create a cause of action for unspecified lesser remedies that are not otherwise available under the law; the only cause of action the statute creates is for receivership. We cannot turn the statute's "all other . . . remedies" language on its head—treating it as expanding rather than restricting the relief the statute provides—and we need not do so to give the language meaning. Instead, the statute provides only the remedy it identifies—rehabilitative receivership—and it restricts the availability of that relief to circumstances where the trial court has determined that "all other available legal and equitable remedies . . . are inadequate."[29] Former art. 7.05(A); *see also* TEX. BUS. ORGS. CODE § 11.404(b).

---

and directors' formal fiduciary duty is owed to the corporation and its shareholders collectively, not to individual shareholder interests); *Somers ex rel. EGL, Inc. v. Crane*, 295 S.W.3d 5, 11 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (same); *Lindley v. McKnight*, 349 S.W.3d 113, 124 (Tex. App.—Fort Worth 2011, no pet.) (same); *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (same). No party in this case has asked us to alter the nature of that duty.

[28] The dissent contends that in this opinion we "abolish," "foreclose," and "extinguish" the lesser remedies preferred by the statute. *Post* at __, __, __. But we have not abolished or even limited the remedies available under the common law or other statutes for the kinds of conduct that give rise to rehabilitative receivership actions, whether under the oppressive-actions prong or other prongs. As we discuss in some detail in Part III of this opinion, the actions that give rise to oppressive-action receivership claims typically also give rise to common-law claims as well, opening the door to a wide array of legal and equitable remedies not available under the receivership statute alone. Those remedies, whether lesser or greater, are not displaced by the rehabilitative receivership statute, which merely adds another potential remedy available in extraordinary circumstances when lesser remedies are inadequate. This very case underscores this point, demonstrating that lesser remedies may remain available as an alternative to receivership in Texas law. We have remanded this case to the court of appeals to consider whether Rupe is entitled to the buyout ordered by the trial court based on her successful breach-of-fiduciary-duty claim. If Rupe prevails on remand, she may obtain the very remedy the dissent says we have abolished.

[29] The dissent contends that we have "effectively rewritt[en] the statute" and rendered the limiting language in subsection (b) of the statute "meaningless" by failing to construe it as impliedly creating new, independent statutory authority to award a broad array of equitable remedies, including a court-ordered stock buyout, and that this "defeats the very purpose of the Legislature's carefully chosen words." *Ante* at __. But the "carefully chosen words" of subsection (b) are limiting, rather than expansive, in nature: a "court may appoint a receiver under Subsection (a) *only if*: . . . the court determines that all other available legal remedies and equitable remedies, including the appointment of a receiver

26

In affirming the trial court's buy-out order, the court of appeals relied on this Court's decision in *Patton v. Nicholas*, 279 S.W.2d 848 (Tex. 1955). But *Patton* involved neither a claim for oppression nor a court-ordered buyout of stock. *Id.* at 849–59. Rather, this Court held in *Patton* that the receivership statute in effect at the time, former article 2293,[30] did not displace Texas courts' power to appoint a receiver as an equitable remedy for existing causes of action (there, a breach of the corporate trust) in "extreme" circumstances. *Id.* at 856–57.[31] Former article 2293, like former article 7.05 and current section 11.404, expressly preserved the availability of receivership as an equitable remedy for a cause of action that invokes the courts' equitable powers. *See* former art. 2293, para. 4; former art. 7.05(A)(3); TEX. BUS. ORGS. CODE § 11.404(a)(3). Our recognition in *Patton* that the statutory action for receivership did not displace Texas courts' historical power to

---

for specific property of the domestic entity under Section 11.404(a), are inadequate." TEX. BUS. & COM. CODE § 11.404(b)(3) (emphasis added). We give those words their plain meaning—limiting the authority of a trial court to grant a rehabilitative receiver under subsection (a) *only if* certain requirements are met. *See id.* This serves the legislative purpose expressed in the statute, which is to preclude the appointment of a receiver if other lesser remedies available under the common law or other statutes (expressly including section 11.404) are adequate.

Importantly, the dissent's attacks underscore the flaws in its own proposed construction of the statute. It asks this Court to ignore the words of the statute, which authorize courts to "appoint a receiver . . . only if . . . all other *available* legal and equitable remedies . . . are inadequate," *id.* § 11.404(b)(3), and instead rewrite the statute to authorize courts to "appoint a receiver or grant any other legal or equitable remedy of any kind, whether otherwise available or not."

[30] *See* Act of April 2, 1887, 20th Leg., R.S., ch. 131, § 1, 1887 Tex. Gen. Laws 119, 119–22, *amended by* Act of March 19, 1889, 21st Leg., R.S., ch. 59, § 1, 1889 Tex. Gen. Laws 55, 55–58 (former TEX. REV. CIV. STAT. art. 2293), *repealed by* Act of May 17, 1985, 69th Leg., R.S. ch. 959, § 9(1), 1985 Tex. Gen. Laws [herein, "former article 2293"].

[31] The cases upon which the Court relied in *Patton* to recognize that the "malicious suppression of dividends" was a wrong in the nature of a breach of fiduciary duty indicate that the Court viewed the wrong as a breach of the formal fiduciary duty owed by corporate officers and directors to the corporation. *See Patton*, 279 S.W. at 394 (citing *Becker v. Dirs. of Gulf City St. Ry. & Real-Estate Co.*, 15 S.W. 1094 (Tex. 1891) and *Cates v. Sparkman*, 73 Tex. 619, 11 S.W. 846 (1889)); *see also Becker*, 15 S.W. at 1095–97 (reversing dismissal of suit for receivership brought by shareholders on behalf of company, alleging company's controllers formed competitor business, fraudulently transferred company's assets to competitor owned by controllers, then consolidated company into competitor); *Cates*, 11 S.W. at 848–50 (affirming dismissal of shareholder's claim against company's controller for devaluation of shares brought by shareholder individually because right of action belonged to corporation).

27

grant receivership as an equitable remedy under a common-law cause of action does not support the court's construction of former article 7.05 to provide a different statutory remedy, a buyout, without regard to any common-law cause of action.

The court of appeals also relied on *Davis* to support the availability of a buy-out order under the statute. 339 S.W.3d at 286–87 (citing *Davis*, 754 S.W.2d at 378–80). *Davis* likewise relied on *Patton*. Both courts' reliance on *Patton* is misplaced, and we reject the holding in *Davis* that former article 7.05 authorizes Texas courts to invoke their "general equity power" to award a buyout of stock as a remedy for oppressive actions under the statute (rather than under a common-law cause of action for which equitable remedies are otherwise available). *Cf. Davis*, 754 S.W.2d at 379; *see also ARGO Data Res. Corp. v. Shagrithaya*, 380 S.W.3d 249, 265 (Tex. App.—Dallas 2012, pet. filed) ("The statute authorizes the court to fashion an equitable remedy if the actions of those in control of a corporation are illegal, oppressive, or fraudulent."). Although the Legislature has made a broad range of equitable remedies available for violations of other statutory causes of action, *see, e.g.*, TEX. BUS. & COM. CODE § 24.008(a)(3), it has not done so here. The Legislature provided a single remedy for oppressive actions under former article 7.05: appointment of a rehabilitative receiver.[32]

---

[32] We need not decide in this case whether a trial court could properly appoint a rehabilitative receiver and authorize or order the receiver to implement a buyout of a shareholder's interests. Under section 11.406, a receiver has "the powers and duties that are stated in the order appointing the receiver" (as that order may be amended over time), and "the powers and duties provided by other laws applicable to receivers." TEX. BUS. ORGS. CODE § 11.406(a)(4), (5). The primary "other laws" applicable to receivers subject their power "to the control of the court" and to actions "authorized by the court," TEX. BUS. & COM. CODE § 64.031, and provides that "the rules of equity govern all matters relating to the appointment, powers, duties, and liabilities of a receiver and to the powers of a court regarding a receiver." *Id*. § 64.004. Thus, "[a] receiver has only that authority conferred by the Court's order appointing him," but, "[t]he order itself must comply with the statute authorizing such appointment." *Ex parte Hodges*, 624 S.W.2d 304, 306 (Tex. 1981) (because statute did not authorize court to empower receiver to supplement or issue court orders, party's failure to

**D.      Conclusion on Statutory Oppressive Actions**

We hold that the decision by Ritchie, Dennard, and Lutes not to meet with Rupe's prospective buyers does not constitute "oppressive" action under former article 7.05, and the court of appeals erred in concluding otherwise. We also hold that appointment of a rehabilitative receiver is the only remedy that former article 7.05 authorizes for oppressive actions. Because the trial court's judgment does not appoint a receiver, we need not consider the other conduct that Rupe alleged was "oppressive."

# III.
## A Common-law Cause of Action for Shareholder Oppression?

This Court has never recognized a common-law cause of action for "minority shareholder oppression." Although the courts of appeals' opinions in this case and in *Davis* both addressed only actions for oppressive actions under the receivership statute, other parties and Texas courts have relied on these opinions to recognize a common-law claim for "shareholder oppression" not based on any statutory authority.[33] When asked in oral argument to identify the source of the directors' alleged duty in this case, Rupe's attorney asserted only that the duty "flows from the statute" and

---

comply with receiver's order could not be basis for contempt). Section 11.404 authorizes the courts to appoint a rehabilitative receiver "to conserve the property and business of the domestic entity and avoid damage to interested parties." TEX. BUS. ORGS. CODE § 11.404(b)(1). An order authorizing or requiring a receiver to buy out a shareholder's interests would be authorized and proper under the statute only if the buyout would both "avoid damage to [an] interested part[y]" and "conserve the property and business of the domestic entity." If the buyout would help the shareholder but hurt the corporation, an order authorizing the receiver to effectuate the buyout would likely not comply with the statute authorizing the appointment. We need not resolve this question here, however, because Rupe did not seek or obtain an order authorizing a rehabilitative receiver to cause RIC to purchase her shares. In fact, Rupe did not seek a rehabilitative receiver at all.

[33] *See, e.g.*, *Cardiac Perfusion Servs., Inc. v. Hughes*, 380 S.W.3d 198, 202 (Tex. App.—Dallas 2012, pet. filed); *Boehringer*, 404 S.W.3d at 32–33; *Redmon*, 202 S.W.3d at 225, 233; *Cotton*, 187 S.W.3d at 699–701; *Gonzalez*, 181 S.W.3d at 392 n.5; *Pinnacle Data Servs.*, 104 S.W.3d at 192; *Willis*, 997 S.W.2d at 803.

"derives from the word oppression in the statute." But because Rupe's pleadings and briefs also assert a common-law claim for shareholder oppression, we must decide whether to recognize such a common-law cause of action under Texas law.

When deciding whether to recognize "a new cause of action and the accompanying expansion of duty," this Court "perform[s] something akin to a cost-benefit analysis to assure that this expansion of liability is justified." *Roberts v. Williamson*, 111 S.W.3d 113, 118 (Tex. 2003). The analysis is complex, requiring consideration of a number of non-dispositive factors including, but not limited to:

- the foreseeability, likelihood, and magnitude of the risk of injury,

- the existence and adequacy of other protections against the risk,

- the magnitude of the burden of guarding against the injury and the consequences of placing that burden on the persons in question, and

- the consequences of imposing the new duty, including

    - whether Texas's public policies are served or disserved

    - whether the new duty may upset legislative balancing-of-interests, and

    - the extent to which the new duty provides clear standards of conduct so as to deter undesirable conduct without impeding desirable conduct or unduly restricting freedoms.

*See Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 410 (Tex. 2009); *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 193 (Tex. 2004); *Thapar v. Zezulka*, 994 S.W.2d 635, 639–40 (Tex. 1999); *Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex. 1994); *Gaff v. Beard*, 858 S.W.2d 918, 920–21 (Tex. 1993). Carefully considering these factors within the context of this case, we

30

decline to recognize a new common-law cause of action for "minority shareholder oppression" in closely held corporations.

## A. Foreseeability, Likelihood, and Magnitude of Potential Injury

By definition, a "closely held" corporation[34] is owned by a small number of shareholders whose shares are not publicly traded.[35] Often, these shareholders enjoy personal relationships as friends or family members in addition to their business relationship.[36] Sometimes, they enter into shareholder agreements to define things like their respective management and voting powers, the apportionment of losses and profits, the payment of dividends, and their rights to buy or sell their shares from or to each other, the corporation, or an outside party. Occasionally, things don't work out as planned: shareholders die, businesses struggle, relationships change, and disputes arise. When, as in this case, there is no shareholders' agreement, minority shareholders who lack both contractual rights and voting power may have no control over how those disputes are resolved. As a group of law school professors appearing as amicus curiae[37] in this case observed, minority shareholders in

---

[34] The Texas Business Organizations Code distinguishes between "closely held corporations" and "close corporations." The Code defines a "closely held corporation" as a corporation that is privately owned (i.e., not publicly traded) by fewer than 35 shareholders. *See* TEX. BUS. ORGS. CODE § 21.563(a); *see also id.* § 101.463 (closely held LLCs). By contrast, the Code allows all corporations to elect to operate as a "close corporation" by so providing in the appropriate corporate documents. *See id.* §§ 21.563(a), 21.701, 21.705–.707.

[35] *See, e.g.*, Douglas K. Moll, *Majority Rule Isn't What It Used to Be: Shareholder Oppression in Texas Close Corporations*, 63 TEX. B.J. 434, 436 (2000) [hereafter, "Moll, *Majority Rule*"] ("A close corporation is a business organization typified by a small number of stockholders, the absence of a market for the corporation's stock, and substantial shareholder participation in the management of the corporation.").

[36] *See id.* ("[C]lose corporation investors are often linked by family or other personal relationships that result in a familiarity between the participants.").

[37] Robert A. Ragazzo, Marc I. Steinberg, Alan R. Bromberg, Joseph K. Leahy, Bruce A. McGovern, Gary S. Rosin, and David Simon Sokolow.

closely held corporations have "no statutory right to exit the venture and receive a return of capital" like partners in a partnership do, and "usually have no ability to sell their shares" like shareholders in a publicly held corporation do; thus, if they fail to contract for shareholder rights, they will be "uniquely subject to potential abuse by a majority or controlling shareholder or group." Unhappy with the situation and unable to change it, they are often unable to extract themselves from the business relationship, at least without financial loss.

Those in control of a closely held corporation may use various "squeeze-out" or "freeze-out" tactics to deprive minority shareholders of benefits, to misappropriate those benefits for themselves, or to induce minority shareholders to relinquish their ownership for less than it is otherwise worth. The types of conduct most commonly associated with such tactics include (1) denial of access to corporate books and records, (2) withholding payment of, or declining to declare, dividends, (3) termination of a minority shareholder's employment, (4) misapplication of corporate funds and diversion of corporate opportunities for personal purposes, and (5) manipulation of stock values.[38]

Our review of the case law and other authorities also convinces us that it is both foreseeable and likely that some directors and majority shareholders of closely held corporations will engage in such actions with a meaningful degree of frequency and that minority shareholders typically will suffer some injury as a result. Although the injury is usually merely economic in nature, it can be quite substantial from the minority shareholder's perspective, as it often completely undermines their

---

[38] *See, e.g.,* Moll, *Majority Rule*, at 436 (listing common "freeze-out" or "squeeze-out" tactics); Rogers, *supra* note 27, at 599–600 (listing conduct typical in oppression cases).

sole or primary motivation for engaging with the business.[39] We thus conclude that the foreseeability, likelihood, and magnitude of harm sustained by minority shareholders due to the abuse of power by those in control of a closely held corporation is significant, and Texas law should ensure that remedies exist to appropriately address such harm when the underlying actions are wrongful.

## B.     Existence and Adequacy of Other Protections

Our conclusion that the risks require a remedy does not end our analysis. *See, e.g.*, *Nabors Drilling*, 288 S.W.3d at 411 (observing that the mere foreseeability of an injury is not sufficient to justify the creation of a new duty). We must next consider the adequacy of remedies that already exist. This is particularly true when we are addressing corporations and the relationships among those who participate in them, which we have consistently recognized are largely matters governed by statute and contract. *See Empire Mills v. Alston Grocery Co.*, 15 S.W. 505 (Tex. App. 1891, no writ) ("A corporation is the creature of a statute immediately creating it, or authorizing proceedings for its organization."); *Calvert v. Capital Sw. Corp.*, 441 S.W.2d 247, 255 (Tex. Civ. App.—Austin 1969, writ ref'd n.r.e.) ("[T]he charter of a corporation creates contractual relations between the corporation and its shareholders, not between the shareholders themselves."). In addition to statutory and contractual protections, we will also consider other common-law remedies that currently exist to protect against the kinds of conduct that might otherwise justify a new common-law remedy.

---

[39] *See, e.g.*, Douglas K. Moll, *Reasonable Expectations v. Implied-in-Fact Contracts: Is the Shareholder Oppression Doctrine Needed?*, 42 B.C. L. REV. 989, 1067 (2001) (observing that when dividends are not paid, "a minority shareholder who is discharged from employment and removed from the board of directors is effectively denied any return on his or her investment").

As we consider existing statutory remedies, we are mindful of the principle that, when the Legislature has enacted a comprehensive statutory scheme, we will refrain from imposing additional claims or procedures that may upset the Legislature's careful balance of policies and interests. *See, e.g.*, *Liberty Mut. Ins. Co. v. Adcock*, 412 S.W.3d 492, 493 (Tex. 2013) (noting that the Texas Workers' Compensation Act "is a comprehensive statutory scheme, and therefore precludes the application of claims and procedures not contained within the Act.").[40] We thus begin in this case by noting that the Business Organizations Code permits corporations to declare themselves to be "close corporations," which allows them to take advantage of two subchapters of the Code dedicated to the special needs of such corporations and exempts them from many of the rules that govern other types of corporations. *See* TEX. BUS. ORGS. CODE §§ 21.701–.732 (subchapter O, Close Corporations), 21.751–.763 (subchapter P, Judicial Proceedings Relating to Close Corporations). In addition to the judicial proceedings that other corporate shareholders can bring, shareholders in close corporations are authorized to institute proceedings to enforce a close corporation provision, appoint a provisional director, or appoint a custodian. *Id.* § 21.752. In such proceedings, courts must enforce close corporation provisions regardless of whether there is an adequate remedy at law and may enforce them by injunction, specific performance, damages, appointment of provisional director or custodian, appointment of a receiver for specific corporate assets, appointment of a rehabilitative receiver, or appointment of a liquidating receiver, among other things. *Id.* § 21.756. And the

---

[40] *See also Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 193–94 (Tex. 2004) ("The existence of a comprehensive regulatory scheme to protect against harm weighs against imposing a common law duty to accomplish the same result if the scheme affords significant protections."); *Mission Petroleum Carriers, Inc. v. Solomon*, 106 S.W.3d 705, 715–16 (Tex. 2003) (declining to impose a new common-law duty on employers who conduct in-house drug testing because "the DOT's comprehensive statutory and regulatory scheme, coupled with the authority granted to the [Medical Review Officer], affords significant protection to employees who are the subject of random drug tests.").

Legislature has afforded businesses that elect to operate as close corporations even greater contractual liberty. *See generally* TEX. BUS. ORGS. CODE §§ 1.001 *et seq.*; *id.* § 21.701–.732. Although RIC's founders and shareholders did not declare RIC a close corporation and take advantage of this unique statutory scheme, we must note that they could have done so, and by doing so could have provided themselves with remedies to resolve the current dispute.

Even when a closely held corporation does not elect to operate as a "close corporation," the Legislature has enacted special rules to allow its shareholders to more easily bring a derivative suit on behalf of the corporation.[41] TEX. BUS. ORGS. CODE § 21.563. Shareholders in a closely held corporation, for example, can bring a derivative action without having to prove that they "fairly and adequately represents the interests of" the corporation, *id.* § 21.552(2), without having to make a "demand" upon the corporation, as in other derivative actions, and without fear of a stay or dismissal based on actions of other corporate actors in response to a demand. *See id.* §§ 21.563(b), 21.553–55, 21.558–59. And when justice requires, the court may treat a derivative action on behalf of a closely held corporation "as a direct action brought by the shareholder for the shareholder's own benefit," and award any recovery directly to that shareholder.[42] *See id.* § 21.563(c).

Of course, shareholders may also prevent and resolve common disputes by entering into a shareholders' agreement to govern their respective rights and obligations. Importantly, the Legislature has granted corporate founders and owners broad freedom to dictate for themselves the

---

[41] *See supra* note 34.

[42] The court may also award the recovery "to the corporation if necessary to protect the interests of creditors or other shareholders of the corporation." TEX. BUS. ORGS. CODE § 21.563(c).

rights, duties, and procedures that govern their relationship with each other and with the corporation. *See, e.g.*, *id.* §§ 21.052–.059, 21.101–.110, 21.210, 21.401–.408. Again, we note that although RIC's owners did not enter into a shareholders' agreement, they certainly could have done so, and by doing so could have avoided the current dispute.[43]

And as a final preliminary matter, we note that various common-law causes of action already exist to address misconduct by corporate directors and officers. Relying on the same actions that support their oppression claims, Texas minority shareholders have also asserted causes of action for: (1) an accounting, (2) breach of fiduciary duty, (3) breach of contract, (4) fraud and constructive fraud, (5) conversion, (6) fraudulent transfer, (7) conspiracy, (8) unjust enrichment, and (9) quantum

---

[43] The dissent concedes that shareholder and buy-sell agreements are a more "ideal[]" means for deciding shareholder disputes. *Post* at __. But it contends that people enter closely held businesses "ill-prepared" and implies that the law should step in to pick up the slack. We cannot accept this premise. Courts generally endeavor to afford citizens broad freedoms in their choices about how to manage their own business endeavors. There are numerous well-established justifications for this approach, not the least of which is that courts are simply ill-suited to the task of second-guessing business decisions made by business people who typically have a more long-term perspective, access to more extensive information, greater experience in the industry, if not in business practices generally, and more interest in the outcome. *See, e.g.*, Eric A. Posner, *A Theory of Contract Law Under Conditions of Radical Judicial Error*, 94 Nw. U. L. Rev. 749, 758 (2000) ("[C]ourts have trouble understanding the simplest of business relationships. This is not surprising. Judges must be generalists, but they usually have narrow backgrounds in a particular field of the law.").

Nor can we assume that the absence of applicable contractual provisions indicates ill-preparedness on the part of business owners. Owners may reasonably choose flexibility over predictability. Minority shareholders may reasonably choose to create mechanisms that would allow them to impede the will of the majority or demand a buyout because they do not want other minority owners to have the same ability to interfere with the operation of the business or to threaten the financial health of the business with an ill-timed demand for buyout.

Finally, even if we accepted the dissent's premise, the buy-out remedy the dissent favors (whether granted under an expansive reading of the receivership statute or the creation of a new common-law cause of action) has not been limited to circumstances where there is no shareholder or buy-sell agreement. In *Cardiac Perfusion Services*, for example, the court of appeals affirmed a buyout of minority shares in direct contravention of the terms of the parties' buy-out agreement. 380 S.W.3d at 204–05. In Illinois, where the statute on which the dissent relies expressly authorizes a buyout in non-public corporations based on oppressive actions, the courts likewise have applied the statute to force buyouts at prices calculated under the statute rather than the parties express agreement and to force buyouts with terms that are contrary to the parties' express terms for exiting the business. *See, e.g.*, *Gingrich v. Midkiff*, 2014 IL App (5th) 120332-U (affirming judgment in case where court calculated buyout price under statute rather than valuation formula in shareholder agreement and where court declined to impose shareholder agreement's non-compete limitation on withdrawing or expelled shareholders).

meruit. *See, e.g.*, *Boehringer*, 404 S.W.3d at 24; *Shagrithaya*, 380 S.W.3d at 262; *Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 365 (Tex. App.—Houston [1st Dist.] 2012, judgm't set aside by agr.); *Strebel v. Wimberly*, 371 S.W.3d 267, 274 (Tex. App.—Houston [1st Dist.] 2012, pet. filed); *Adams v. StaxxRing, Inc.*, 344 S.W.3d 641, 643 (Tex. App.—Dallas 2011, pet. denied); *Redmon*, 202 S.W.3d at 231; *DeWoody v. Rippley*, 951 S.W.2d 935, 944 (Tex. App.—Fort Worth 1997, no writ); *Davis*, 754 S.W.2d at 377.

Having noted the extensive statutory, contractual, and common-law protections that already exist under Texas law, we now consider the adequacy of those protections to address the kinds of conduct commonly cited as justifying the creation of liability for "shareholder oppression."

1.      **Denial of Access to Corporate Books and Records**

A common complaint of those alleging shareholder oppression is the denial of access to the corporation's books and records. Our Legislature has expressly protected a corporate shareholder's right to examine corporate records, provided penalties for a violation of those rights, and identified applicable defenses in an action to enforce those rights. *See* TEX. BUS. ORGS. CODE §§ 21.218 (examination of records), 21.219 (annual and interim statements of corporation), 21.220 (penalty for failure to prepare voting list), 21.222 (penalty for refusal to permit examination), 21.354 (inspection of voting list), 21.372 (shareholder meeting list). These statutory rights and remedies adequately protect a minority shareholder's access to corporate records, and we need not create a new common-law cause of action to supplement that protection.[44]

---

[44] The dissent accuses Ritchie, Dennard, and Lutes of withholding corporate records from Rupe, but the court of appeals held that there was no evidence of such actions and Rupe did not appeal that holding.

## 2.     Withholding or Refusing to Declare Dividends

A second common complaint by those alleging shareholder oppression relates to the corporation's declaration of dividends, including the failure to declare dividends, the failure to declare higher dividends, and the withholding of dividend payments after a dividend has been declared.[45] With regard to the latter situation, we note that shareholders already have a right to receive payment of a declared dividend in accordance with the terms of the shares and the corporation's certificate of formation, and they can enforce that right as a debt against the corporation. *See, e.g.*, *Cavitt v. Amsler*, 242 S.W. 246, 247 (Tex. Civ. App.—Austin 1922, writ dism'd) ("[W]hen a dividend is declared, it becomes a debt owing by the corporation to the stockholders."). Our review of the cases gives us no reason to doubt the adequacy of this remedy to address that particular situation.

With regard to the failure to declare dividends and the failure to declare higher dividends, Texas statutes generally do not dictate when directors must declare dividends or how much the dividends must be.[46] Instead, those decisions fall within the discretion of a corporation's directors (or those acting as directors). *See* TEX. BUS. ORGS. CODE §§ 21.302–.303, 21.310–.313; *see also id.* §§ 21.714, 21.726–.727. The directors must make those decisions in compliance with the formal fiduciary duties that they, as officers or directors, owe to the corporation, and thus to the shareholders

---

[45] The declaration of dividends for some but not all classes of stock could also form the basis for such a complaint, but we have not seen this kind of claim in Texas cases. When a Texas corporation has more than one class of shares, the corporation's certificate of formation must specify the preferences, limitations, and relative rights of the shares. TEX. BUS. ORGS. CODE § 3.007(b)(4).

[46] The Legislature has, however, placed limits on corporate dividends, distributions, and redemptions, primarily to protect the corporation's creditors. TEX. BUS. ORGS. CODE §§ 21.301–.318 (Subchapter G).

collectively. *See, e.g.*, *Holloway*, 368 S.W.2d at 576–77 (as fiduciaries, corporate directors are "under obligation not to usurp corporate opportunities for personal gain," and must dedicate "uncorrupted business judgment for the sole benefit of the corporation"). When directors breach their fiduciary duties by improperly withholding or failing to declare dividends, one or more shareholders can sue the directors for breach of those duties on behalf of the corporation through a derivative action. *See* TEX. BUS. ORGS. CODE §§ 21.551–.563.[47]

This Court first addressed this kind of a claim in the context of a closely held corporation nearly sixty years ago in *Patton*. 279 S.W.2d at 849–53. Although there seems to be some confusion in the courts of appeals, *Patton* was not a "shareholder oppression" case.[48] It was a suit in which a corporation's two minority shareholders alleged that Patton—the corporation's majority shareholder, president, and controlling board member—committed fraud and breached his duties to the corporation.[49] *See id.* at 849. The jury found that Patton had mismanaged the corporation and withheld dividends for the improper purposes of preventing the minority shareholders from sharing

---

[47] A corporation may not limit its directors' liability for bad faith breaches of their duties to the corporation, breaches of their duty of loyalty, or transactions from which the directors receive an improper benefit. TEX. BUS. ORGS. CODE § 7.001(b), (c).

[48] The *Patton* opinion uses the word "oppression" only once, when describing the kind of future conduct that a rehabilitative receivership may be designed to prevent, in the context of a New Jersey case involving fraud claims by one corporate director against two other corporate directors. *Patton*, 279 S.W.2d at 857 (citing *Laurel Springs Land Co. v. Faugeray*, 26 A. 886, 887 (N.J. 1893)).

[49] In *Patton*, we used the phrase "breach of trust," 279 S.W.2d at 854, rather than "breach of fiduciary duty," which has since become the more common phrase outside of trustee actions. The courts have used the two phrases interchangeably. *See, e.g.*, *Phillips v. Phillips*, 820 S.W.2d 785, 792 (Tex. 1991) (Gonzalez, J., dissenting) ("Courts impose damages on parties who violate a fiduciary duty in order to punish the party's breach of trust."); *Paddock v. Siemoneit*, 218 S.W.2d 428, 432 (Tex. 1949) ("Acts which might well be considered breaches of trust as to other fiduciaries have not always been so regarded in cases of corporate officers or directors."); *Kaufman & Runge v. B. Alexander & Bro.*, 53 Tex. 562, 568 (1880) (finding no claim "involving any bad faith or breach of trust on the part of the agents in appropriating as their own that which, by reason of their fiduciary relation, they were bound to hold in trust for their principals.").

in the corporation's profits and depreciating the value of the corporation's stock. *Id.* The trial court appointed a receiver to liquidate the corporation. *Id.*

We rejected the minority shareholders' mismanagement claims, but we recognized that the finding that Patton had used "his control of the board for the malicious purpose of . . . preventing dividends and otherwise lowering the value . . . of the stock of the [minority shareholders], is something else." *Id.* at 853. We equated this finding with a "breach of trust for which the courts will afford a remedy," *id.* at 854, and the cases on which we relied indicate that we treated that claim as being brought by the shareholders on behalf of the corporation. *See id.* (citing *Becker v. Dirs. of Gulf City St. Ry. & Real-Estate Co.*, 15 S.W. 1094 (Tex. 1891); *Cates v. Sparkman*, 73 Tex. 619, 11 S.W. 846 (1889)). We determined that the appropriate remedy in that circumstance was an injunction order compelling payment of the dividends. *Id.* at 859.[50]

*Patton* demonstrates that when a corporate director violates the duty to act solely for the benefit of the corporation and refuses to declare dividends for some other, improper purpose, the director breaches fiduciary duties to the corporation, and the minority shareholders are entitled to

---

[50] The trial court had awarded a liquidating receivership, and we rejected that remedy as too severe. *Id.* at 859. We noted that although the statutes in effect at the time provided only for dissolution and liquidation, the Legislature had recently passed the not-yet-effective Business Corporation Act, which favored rehabilitative receivership over liquidation when the business was solvent. *Id.* at 854. Citing precedents in which we "seem[ed] to recognize a minority right to receivership in cases of *gross or fraudulent mismanagement*, although without particular reference to whether liquidation or something else is to follow," we concluded that, in the "more extreme" cases, Texas courts could, under their general equity power, appoint a receiver "for the less drastic purpose of 'rehabilitation'" as remedy for the majority shareholder's breach of fiduciary duty, rather than appointing a liquidating receiver under the statute. *Id.* at 857 (emphasis added). As discussed above, this holding related to Texas courts' power to grant different types of receiverships as equitable remedies for existing causes of action—in *Patton*, breach of fiduciary duty—and not whether the receivership statutes created new statutory remedies other than receivership. *See id.*

relief, either directly to the corporation or through a derivative action.[51] *See Landon v. S & H Mktg. Group, Inc.*, 82 S.W.3d 666, 677 (Tex. App.—Eastland 2002, no pet.) (upholding breach-of-fiduciary-duty claim against officer-director who improperly authorized $40,000 bonus payment to himself). If, on the other hand, the director's decision not to declare dividends is made for the benefit of the corporation, in compliance with the duties of care and loyalty, no relief is warranted. In that instance, a director generally will have fulfilled the duties by acting in the best interest of the corporation, even if there was an incidental injury to one or more individual shareholders. *See, e.g.*, *Rowe v. Rowe*, 887 S.W.2d 191, 198 (Tex. App.—Fort Worth 1994, writ denied) (holding that shareholder could not prevail on breach-of-fiduciary-duty claim against other shareholder because alleged mishandling of funds did not result in any injury to the corporation).

In sum, a remedy exists for dividend decisions made in violation of a director's duties to the corporation and its shareholders collectively, but no remedy exists for decisions that comply with those duties, even if they result in incidental harm to a minority shareholder's individual interests. But even when a corporate controller's dividend decision itself does not give rise to a remedy, that is not typically the end of the inquiry. Allegations that directors or controlling shareholders are manipulating dividends to "oppress" minority shareholders typically arise when the accused not only withhold dividends but also use some method to distribute the corporation's profits exclusively to themselves—frequently, by inflating their own salaries. *See, e.g.*, *Boehringer*, 404 S.W.3d at 31–32 (addressing failure to pay dividends coupled with increase in controlling shareholder-director's

---

[51] *Patton* is thus contrary to the dissent's assertion that majority shareholders can simply refuse to declare dividends for their own personal benefit rather than in the best interest of the corporation. *See post* at __.

41

salary).[52] As discussed below, when corporate controllers misappropriate corporate funds for their own use or pay themselves excessive salaries out of corporate coffers, they do so in violation of their fiduciary duty to the corporation, and the law affords a remedy for that misconduct.

We therefore conclude that the existing duties and remedies applicable to corporate dividend declarations and payments offer adequate protections for minority shareholders under most circumstances.[53] This case does not present any extreme or unusual circumstances that would justify the imposition of additional duties and remedies.

### 3. Termination of Employment

A third common complaint of those alleging minority shareholder oppression relates to the termination of the minority shareholder's employment with the corporation. A minority shareholder's loss of employment with a closely held corporation can be particularly harmful because

---

[52] Shareholders can utilize a shareholders' agreement to set the terms of an officer's or director's salary and employment, thus preventing the officers and directors from making those decisions for themselves. *See* TEX. BUS. ORGS. CODE §§ 21.101(a)(4), 21.714(b)(9).

[53] The dissent contends that "typical acts of minority oppression (refusing to pay dividends, paying majority shareholders outside the dividend process, and making fire-sale buyout offers) usually operate to benefit the corporation and hardly ever harm it." *Post* at __. But the dissent offers no support for this broad proposition, and we do not agree that this is a valid assumption. The dissent confuses the corporation's interests with the individual interests of its majority shareholders. But a corporate officer or director's duty is to the corporation and its shareholders collectively, not any individual shareholder or subgroup of shareholders, even if that subgroup represents a majority of the ownership. *See, e.g.*, *Redmon*, 202 S.W.3d at 233; *Somers*, 295 S.W.3d at 11; *Lindley*, 349 S.W.3d at 124; *Hoggett*, 971 S.W.2d at 488. We do not determine the best interest of the corporation by examining only the interest of its majority shareholder(s). *See Holloway*, 898 S.W.2d 797 (holding that corporate officer and majority shareholder could be held liable for acting "in a manner that served his interests at the expense of the other shareholders" because his interests and the corporation's were not necessarily aligned). Refusal to pay dividends, paying majority shareholders outside the dividend process, and making fire-sale buyout offers certainly can harm the corporation, for instance, by lowering the value of its stock. As *Patton* itself demonstrates, the very conduct the dissent claims does not harm the corporation in fact can give rise (and has given rise in the past) to a breach-of-fiduciary-duty claim against the corporate controller who engaged in such conduct to benefit himself at the expense of the corporation. 279 S.W.2d at 853 (holding majority shareholder liable when he used "his control of the board for the malicious purpose of . . . preventing dividends and otherwise lowering the value . . . of the stock of the [minority shareholders]").

a job and its salary are often the sole means by which shareholders receive a return on their investment in the corporation. We must be particularly careful in considering this complaint, however, because Texas is steadfastly an at-will employment state. "For well over a century, the general rule in this State, as in most American jurisdictions, has been that absent a specific agreement to the contrary, employment may be terminated by the employer or the employee at will, for good cause, bad cause, or no cause at all." *Montgomery Cnty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998). We need not address the policy reasons for our commitment to at-will employment in detail here, but we note that we have consistently recognized that it benefits both employees, by allowing them to change employers freely as they deem best, and employers, by allowing them to make employment decision as they deem best, without second-guessing by courts and juries. *See, e.g.*, *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 776 (Tex. 2011) ("A person's right to use his own labor in any lawful employment is . . . one of the first and highest of civil rights.") (quoting *Int'l Printing Pressmen & Assistants' Union of N. Am. v. Smith*, 145 Tex. 399, 198 S.W.2d 729, 740 (1947)); *Chevron Corp. v. Redmon*, 745 S.W.2d 314, 318 (Tex. 1987) ("Employers should have the right and the freedom to make their employment decisions without interference unless they discriminate against some protected group which might otherwise be unfairly denied employment.").

Although at-will employment is the default, employers and employees have the freedom to contract for a different employment relationship. *See* TEX. BUS. ORGS. CODE § 2.101(5). In fact, the Business Organizations Code expressly permits corporate shareholders to memorialize the terms of employment for a director, officer, or other employee in a shareholders' agreement. *Id.* §§ 21.101(a)(4), 21.714(b)(9). In the absence of such a contract, however, we may not presume that the

43

company and its shareholders elected to forgo their at-will employment rights, for to do so would violate this State's strong policy in favor of at-will employment. *Cf. Tex. Farm Bureau Mut. Ins. Cos. v. Sears*, 84 S.W.3d 604, 608 (Tex. 2002) ("At-will employment is an important and long-standing doctrine in Texas, and we have been reluctant to impose new common-law duties that would alter or conflict with the at-will relationship." (citations omitted)).

There may be situations in which, despite the absence of an employment agreement, termination of a key employee is improper, for no legitimate business purpose, intended to benefit the directors or individual shareholders at the expense of the minority shareholder, and harmful to the corporation. Though the ultimate determination will depend on the facts of a given case, such a decision could violate the directors' fiduciary duties to exercise their "uncorrupted business judgment for the sole benefit of the corporation" and to refrain from "usurp[ing] corporate opportunities for personal gain." *Holloway*, 368 S.W.2d at 577; *see also Gearhart Indus.*, 741 F.2d at 723–24. As we have already discussed, a shareholder may enforce these duties through a derivative action, *see* TEX. BUS. ORGS. CODE §§ 21.551–.563, and the Legislature's special rules would apply if the matter involved a closely held corporation. *Id.* §§ 21.563(b), 21.751–.763. We also note that such actions could potentially be "oppressive" under section 11.404, and thus justify the appointment of a rehabilitative receiver. *See* TEX. BUS. ORGS. CODE § 11.404(a)(1)(C); *see also* former art. 7.05(A)(1)(c). For employment terminations that fall short of these extreme circumstances, however, our commitment to the principles of at-will employment compels us to conclude that the opportunity to contract for any desired employment assurances is sufficient.

### 4. Misapplication of Corporate Funds and Diversion of Corporate Opportunities

A fourth common complaint of minority shareholders involves the misapplication of corporate funds and diversion of corporate opportunities. As to this complaint, we need only note that the duty of loyalty that officers and directors owe to the corporation specifically prohibits them from misapplying corporate assets for their personal gain or wrongfully diverting corporate opportunities to themselves. *See, e.g.*, *Holloway*, 368 S.W.2d at 576 ("A corporate fiduciary is under obligation not to usurp corporate opportunities for personal gain, and equity will hold him accountable to the corporation for his profits if he does so."); *Dunagan v. Bushey*, 152 Tex. 630, 636, 263 S.W.2d 148, 152 (1953) ("The directors of a corporation stand in a fiduciary relationship to the corporation and its stockholders, and they are without authority to act as such in a matter in which a director's interest is adverse to that of the corporation. The directors are not permitted to appropriate the property of the corporation to their benefit, nor should they permit others to do so."); *see also* TEX. BUS. ORGS. CODE § 7.001(c)(1), (3). Like most of the actions we have already discussed, these types of actions may be redressed through a derivative action, or through a direct action brought by the corporation, for breach of fiduciary duty.[54] *See, e.g.*, *Holloway*, 368 S.W.2d at 576; *Becker*, 15 S.W. at 1095–97 (permitting shareholders to bring suit on behalf of company for corporate directors' alleged misapplication of corporate funds); *see also Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1999) (holding that sole shareholder could recover on behalf of company,

---

[54] The dissent's contention that this Court should recognize a common-law duty between majority and minority shareholders, rather than between corporate controllers and the corporation, for this kind of conduct is contrary to well-established Texas law. *See, e.g.*, *Murphy v. Campbell*, 964 S.W.2d 265, 268 (Tex. 1997) (citing *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990) for the proposition that "one corporate stockholder cannot recover damages from another for misappropriation of corporate assets").

but not in individual capacity, for former shareholder and officer's misappropriation of corporate assets). And in limited circumstances, as we have discussed, the shareholder may sue directly for a rehabilitative receivership. *See* former art. 7.05(A)(1); TEX. BUS. ORGS. CODE § 11.404(a)(1).

Because the potential harm here is to the corporation and the shareholders collectively, this misconduct does not weigh in favor of recognizing an additional common-law remedy for individual shareholders.

### 5. Manipulation of Stock Values

The final common minority shareholder complaint that we will address involves the directors' manipulation of the value of the corporation's stock. Although not alleged here, there may be circumstances in which the controlling shareholders or directors of a closely held corporation seek to artificially deflate the shares' value, perhaps to allow the company or its shareholders to purchase a minority shareholder's shares for less than their true market value, or to hinder a minority shareholder's sale of shares to third parties. *See, e.g.*, *Patton*, 279 S.W.2d at 849–53. As a rule, however, claims based on such conduct belong to the corporation, rather than the individual shareholder. *See Mass. v. Davis*, 140 Tex. 398, 407, 168 S.W.2d 216, 221 (1942). As we explained over 70 years ago:

> Generally, the individual stockholders have no separate and independent right of action for injuries suffered by the corporation which merely result in the depreciation of the value of their stock. This rule is based on the principle that where such an injury occurs each shareholder suffers relatively in proportion to the number of shares he owns, and each will be made whole if the corporation obtains restitution or compensation from the wrongdoer. Such action must be brought by the corporation, not alone to avoid a multiplicity of suits by the various stockholders and to bar a subsequent suit by the corporation, but in order that the damages so recovered may be available for the payment of the corporation's creditors, and for proportional

46

distribution to the stockholders as dividends, or for such other purposes as the directors may lawfully determine.

*Id.*[55]

As with the other conduct we have addressed, the directors' fiduciary duties to the corporation provide protection for minority shareholders affected by such conduct when the conduct harms them in their capacity as shareholders. Though we recognize that the directors may endeavor in such conduct to harm the interests of one or more individual minority shareholders without harming the corporation (i.e., without giving rise to damages recoverable in a derivative suit), for the reasons discussed below, we cannot adopt a common-law rule that requires directors to act in the best interests of each individual shareholder at the expense of the corporation.[56]

### 6. Summary of Existence and Adequacy of Other Protections

The Legislature has already dictated what rights of access a shareholder has to corporate books and records, and no party alleges that the Legislature's statutory scheme is inadequate to protect shareholders in closely held corporations from improper denial of access to corporate records. *See, e.g.*, *D'Unger*, 207 S.W.3d at 331; *O'Bryant*, 18 S.W.3d at 216; *Austin*, 967 S.W.2d at 401. The four remaining categories of conduct identified as frequent causes of shareholder

---

[55] An exception to this rule may apply when the conduct in question breaches a specific duty owed by the actor to the individual shareholder, such as when the conduct gives rise to a breach of contract claim. *See Davis*, 168 S.W.2d at 221; *Wingate v. Hajdik*, 795 S.W.2d at 719; *see also Miga v. Jensen*, 96 S.W.3d 207 (Tex. 2002) (action by one shareholder against another for breach of contract for option to purchase stock).

[56] Of course, if the controlling directors or shareholders act fraudulently to manipulate the shares' value, additional common-law and statutory remedies may apply. *See, e.g.*, TEX. REV. CIV. STAT. art. 581 (Texas Securities Act); TEX. BUS. & COM. CODE § 27.01 (fraud in real estate and stock transactions); *Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 369 (Tex. App.—Houston [1st Dist.] 2012, judgm't set aside by agr.) (addressing fraud claims relating to closely held company's purchase of minority shareholders' shares).

oppression—withholding or refusing to declare dividends, termination of employment, misapplication of corporate funds or misappropriation of corporate opportunities, and manipulation of corporate share values—all relate to business decisions that fall under the authority of a corporation's offices and directors. As such, they are subject to an officer or director's fiduciary duties to the corporation. We conclude that these legal duties are sufficient to protect the legitimate interests of a minority shareholder by protecting the well-being of the corporation.[57] Absent a contractual or other legal obligation,[58] the officer or director has no duty to conduct the corporation's business in a manner that suits an individual shareholder's interests when those interests are not aligned with the interests of the corporation and the corporation's shareholders collectively.

We recognize that our conclusion leaves a "gap" in the protection that the law affords to individual minority shareholders, and we acknowledge that we could fill the gap by imposing a common-law duty on directors in closely held corporations not to take oppressive actions against an individual shareholder even if doing so is in the best interest of the corporation. To determine whether imposing such a duty is advisable, however, we must consider the public policies at play, the consequences of imposing the duty, the duty's social utility, and whether the duty would conflict

---

[57] The dissent asserts that our "inclusion of [the business judgment rule] in the definition of oppression negates the very protection the oppression statute afforded until today." *Post* at __. We note that what the dissent calls "the oppression statute," the Legislature refers to as a rehabilitative receivership statute, only one prong of which includes oppression as one of three types of conduct addressed in that prong. *See* former art. 7.05; TEX. BUS. & COM. CODE § 11.404 (titled "appointment of receiver to rehabilitate domestic entity" and located in the "receivership" subchapter of the Code); *id.* § 11.404(a)(1)(C) (authorizing receivership for "illegal, oppressive, or fraudulent" actions by the governing persons of a domestic entity).

[58] We have recognized that in some circumstances a special relationship of trust may arise between parties prior to and independent from the parties' business relationship, which can give rise to informal fiduciary duties. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176–77 (Tex. 1997).

with existing law or upset the Legislature's careful balancing of competing interests in governing business relationships.

## C.      Consequences of Proposed Duty

"Tort law . . . cannot remedy every wrong." *Roberts v. Williamson*, 111 S.W.3d 113, 118 (Tex. 2003). "The fundamental purposes of our tort system are to deter wrongful conduct, shift losses to responsible parties, and fairly compensate deserving victims." *Id.* We do not believe that the creation of a common-law claim for minority shareholder oppression would fulfill these purposes, nor is the creation of such a claim necessary to do so.

We begin by considering the type of actions that would qualify as "oppressive" under a common-law cause of action. In deciding whether to recognize a new common-law cause of action, we must consider whether the new duty would provide clear standards that would deter the undesirable conduct without deterring desirable conduct or unduly restricting freedoms. *See Nabors Drilling*, 288 S.W.3d at 410; *Gomez*, 146 S.W.3d at 193. As our discussion of the Legislature's undefined usage of the term "oppressive" has revealed, the term falls far short of providing any clear standards. Adopting the Legislature's intended meaning of "oppressive" as the same meaning for a common-law claim would merely duplicate the statutory cause of action while permitting remedies that the Legislature has chosen not to permit. Yet adopting a meaning of "oppressive" that differs from the Legislature's would only create more confusion and foster both uncertainty and unnecessary

litigation. *See Roberts*, 111 S.W.3d at 118–19 (observing that proposed duty would "foster uncertainty" as well as disparity in recovery among similarly situated parties).[59]

Even the most developed common-law standards for "oppression"—the "reasonable expectations" and "fair dealing" tests—have been heavily criticized for their lack of clarity and predictability.[60] The "reasonable expectations" test may be less amorphous than a case-by-case analysis of whether actions are "fair," but application becomes increasingly difficult when the complaining shareholder obtained his or her shares by gift or inheritance, as was the case here and as is a common occurrence in closely held businesses.[61]

Ultimately, because the standard is so vague and subject to so many different meanings in different circumstances, we conclude that creating new and independent legal remedies for "oppressive" actions is simply bad jurisprudence. Although we do not foreclose the possibility that

---

[59] *See also Graff*, 858 S.W.2d at 921 (addressing difficulties arising from imposing a duty without a clear standard of how the duty is satisfied); *Twyman v. Twyman*, 855 S.W.2d 619, 629 (Tex. 1993) (Hecht, J., concurring and dissenting) ("The wrongful conduct for which the common law offers redress by an award of damages should be defined by standards sufficiently objective and particular to allow a reasonable assessment of the likelihood that certain behavior may be found to be culpable, and to adjudicate liability with some consistency in the various cases that arise.").

[60] *See, e.g.*, Timothy J. Storm, *Remedies for Oppression of Non-Controlling Shareholders in Illinois Closely-Held Corporations: An Idea Whose Time Has Gone*, 33 LOY. U. CHI. L.J. 379, 383–84, 435 (2002) (observing that "[a]lthough entire treatises have been written on the subject of minority shareholder oppression, a precise definition remains elusive," that "much of the relevant case law defines oppression more by what it is not, than by what it is," and that "[e]ven proponents of a view of oppression that recognizes the non-controlling shareholder's reasonable expectations admit that these are often 'just vague and half-articulated understandings.'") (quoting F. Hodge O'Neal, *Close Corporations: Existing Legislation and Recommended Reform*, 33 BUS. LAW. 873, 886 (1978)); Sandra K. Miller, *How Should U.K. and U.S. Minority Shareholder Remedies for Unfairly Prejudicial or Oppressive Conduct Be Reformed?*, 36 AM. BUS. L.J. 579, 617 (1999) ("A vague reasonable expectations approach raises concerns for practitioners because in any particular case it is difficult to predict how a court will rule. It is difficult to counsel a minority owner who may be reluctant to proceed with litigation in the face of an uncertain result. It also is difficult to counsel the majority shareholder as to what conduct is acceptable, particularly after a shareholder dispute develops.").

[61] *See, e.g.*, Hunter J. Brownlee, *The Shareholders' Agreement: A Contractual Alternative to Oppression As A Ground for Dissolution*, 24 STETSON L. REV. 267, 286 (1994) (noting that "reasonable expectations" is a vague standard and subject to greater obscurity when some shareholders received their shares by inheritance or gift).

a proper case might justify our recognition of a new common-law cause of action to address a "gap" in protection for minority shareholders, any such theory of liability will need to be based on a standard that is far more concrete than the meaning of "oppressive."

In addition, even if we were to utilize the Legislature's intended meaning of the term "oppressive," our consideration of the competing interests and consequences convinces us to decline to expand a claim for shareholder oppression to provide relief beyond appointment of a rehabilitative receiver. In this context, we must consider not only the interests of the minority shareholder, but also the potential consequences to the corporation itself, the officers and directors on whom the duty is imposed, the other shareholders of the corporation, and business relationships in general. *See, e.g.*, *Strickland v. Medlen*, 397 S.W.3d 184, 185 (Tex. 2013) (listing a myriad of unintentional consequences that might attend liability for compensating emotional damages arising from the loss of a pet). Imposing on directors and officers a common-law duty not to act "oppressively" against individual shareholders is the equivalent of, or at least closely akin to, imposing on directors and officers a fiduciary duty to individual shareholders. We have not previously recognized a formal fiduciary duty to individual shareholders, and we believe that better judgment counsels against doing so.[62]

---

[62] *See, e.g.*, Mark J. Loewenstein & William K.S. Wang, *The Corporation as Insider Trader*, 30 DEL. J. CORP. L. 45, 52 (2005) ("The very idea that a corporation has a fiduciary duty to individual shareholders is troubling. The corporation can act only through its board of directors, officers, employees, and other agents. These actors are obligated to act in the best interests of the corporation, which may not coincide with the best interests of an individual shareholder transacting business with the corporation. There is no reason to impose a fiduciary obligation on these actors to act in the best interests of an individual shareholder when that shareholder proposes a course of conduct not in the best interests of the corporation.").

Finally, we consider public policies regarding the role of the judiciary in government and in society. As we previously noted, we have consistently recognized that corporate relationships are largely matters governed by statute and contract. More than a century ago, this Court expressed our reluctance to allow courts to "control or interfere in the management of the corporate or internal affairs of an incorporated company." *Cates*, 11 S.W. at 848–49; *see also Kroese v. Gen. Steel Castings Corp.*, 179 F.2d 760, 763 (3d Cir. 1950) ("Courts are rightly reluctant to interfere with the management of a business concern by the individuals who have been selected by its owners to manage it."); *Salgo v. Matthews*, 497 S.W.2d 620, 625 (Tex. Civ. App.—Dallas 1973, writ ref'd n.r.e.) (discussing the dangers of court intervention in ongoing stockholder disputes). We are equally reluctant to permit courts to interfere with the freely negotiated terms of a private contract, or to insert into such a contract rights or obligations that the parties could have bargained for but did not. *See Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996). The Legislature has by statute provided a remedy for "oppressive" actions that is limited yet sufficient, and shareholders in closely held corporations may further define their respective rights and obligations through shareholder agreements.

## D.      Conclusion on Common-law Action for Oppression

The Legislature has crafted a statutory scheme governing domestic corporations. The statutes are detailed and extensive, reflecting legislative policy judgments about when the government should step in to impose rights and obligations on the parties and when the parties should be free to dictate their own rights and obligations vis-à-vis each other and the business. This Court has the prerogative to superimpose a common-law cause of action upon this statutory framework—though not to alter

or contravene the statutory framework—but we exercise that power sparingly, careful not to upset the Legislative balance of policies, and only when warranted by a genuine need. *See, e.g.*, *D'Unger*, 207 S.W.3d at 331; *O'Bryant*, 18 S.W.3d at 216; *Austin*, 967 S.W.2d at 401; *see also Twyman*, 855 S.W.2d at 630 (Hecht, J., joined by Enoch, J., concurring in part and dissenting in part) ("This Court, as steward of the common law, possesses the power to recognize new causes of action, but the mere existence of that power cannot justify its exercise. There must be well-considered, even compelling grounds for changing the law so significantly. Where, as here, no such grounds are given, the decision is more an exercise of will than of reason."). We find no such necessity here, and therefore decline to recognize a common-law cause of action for "shareholder oppression."

## IV.
## Breach of Informal Fiduciary Duties

Finally, we address Rupe's contention that we may affirm the trial court's buy-out order based on the jury's finding in her favor on her breach-of-fiduciary-duty claim. Rupe's fiduciary duty claim is not based on the formal fiduciary duties that officers and directors owe to the corporation by virtue of their management position. Rather, Rupe alleged, and the jury found, that an informal fiduciary relationship existed between her and Dennard, Ritchie, and Lutes.[63] In the court of appeals, Dennard, Ritchie, and Lutes challenged whether such a relationship existed and whether Dennard, Ritchie, and Lutes breached any fiduciary duties if they did exist. They also argued that a court-ordered buyout is not available as a remedy for Rupe's breach-of-fiduciary-duty claim. Because the

---

[63] As noted above, an informal fiduciary duty may arise from "a moral, social, domestic or purely personal relationship of trust and confidence," and its existence is generally a question of fact for the jury. *See Cathey*, 167 S.W.3d at 330–31 (quoting *Associated Indem. Corp.*, 964 S.W.2d at 287).

court of appeals based its decision solely on the finding of oppressive conduct, we remand this case to the court of appeals so that it may resolve Dennard, Ritchie, and Lutes's challenges to Rupe's breach-of-fiduciary-duty claim. The court of appeals previously found that the evidence does not support the jury's valuation of Rupe's shares. Thus, if the court of appeals concludes that Rupe may recover on her breach-of-fiduciary-duty claim, and that the buyout order is available as a remedy, it will need to remand the case to the trial court for a redetermination of the value of Rupe's shares and whether the buyout is equitable in light of the newly determined value and the impact that a buyout at that price will have on RIC and its other shareholders.

## V.
## Conclusion

For the reasons expressed, we reverse the court of appeals' judgment and remand the case to that court for further proceedings consistent with this opinion.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: June 20, 2014