COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  |  |  |
|---|---|---|
| | § | |
| ELYSA FENENBOCK AND | | No. 08-19-00093-CV |
| LAUREN FENENBOCK, | § | |
| | | Appeal from the |
| Appellants, | § | |
| | | County Court at Law Number Five |
| v. | § | |
| | | of El Paso County, Texas |
| W. SILVER RECYCLING, INC., | § | |
| | | (TC# 2017DCV0825) |
| Appellee. | § | |

**O P I N I O N**

This case comes to us following a trial court's determination of the value of a business. The valuation was used to determine the compensation due to minority shareholders who lost their stock when the business merged with another entity. Unhappy with the trial court's finding, the minority shareholders contend that the company committed fraud in supplying information to the court-appointed appraiser that testified at the valuation hearing. Additionally, the minority shareholders claim they proved that the business juggled its pre-merger profits and losses so as to increase the minority shareholders' income tax liability. The trial court had all these issues before it and expressly or impliedly rejected them. Given our standard of review for the several fact-findings that were made below, and those findings that the minority shareholders needed to sustain their claim, we affirm the trial court's judgment.

1

# I. BACKGROUND

Bernard and Jeannette Fenenbock were owners of a recycling business known as W. Silver Recycling, Inc. (hereinafter, WSR).  They raised two children, Glenna and Mark.  Glenna married Phil Gaddy, and they had two children, Weston and Lane Gaddy.  Mark also had two children, Elysa and Lauren Fenenbock, who are the Appellants in this case.  During Bernard and Jeannette's lifetime, and after their death by devise, they gifted or sold stock in WSR to their children, grandchildren, or to two trusts.  Based on those transfers, by 2016 the stock in WSR was held in the following percentages:  Lane Gaddy (32.32%); Glenna Gaddy (20.26%); Fenenbock Living Trust (13.03%); Fenenbock Credit Shelter Trust (13.03%); Weston Gaddy (7.70%); Elysa Fenenbock (6.84%); Lauren Fenenbock (6.84%).  Collectively, the "Gaddys" held the controlling block of stock and the two Fenenbock sisters were minority shareholders.

On December 7, 2016, WSR merged with Argentum Recycling, Inc. (Argentum).  Under terms of the merger, certain shareholders were offered one share of Argentum stock in exchange for one share of WSR stock.  But the plan also provided that  Elysa and Lauren's shares would be converted into the debt to be paid in cash equal to the fair value of their shares.  The new corporation immediately changed its name back to W. Silver Recycling, Inc., but to avoid confusion, we refer to it here as Argentum.  It soon thereafter also declared a dividend that would be paid to its newly designated owners, thus excluding Elysa and Lauren.

## A.  The first lawsuit

Even before the merger, Elysa and Lauren were unhappy with management of WSR and filed suit against the company and two of its board members, Lane and Weston Gaddy.  This first suit alleged claims for breach of fiduciary duty, shareholder oppression, shareholder derivative claims, fraud, and failure to provide corporate information.  During the pendency of that suit, WSR

2

announced the merger plan, and Elysa and Lauren then amended their pleading to add additional fraud allegations pertaining to the merger. In addition to monetary damages, they sought a judicial decree declaring the merger a nullity. Following a two-week trial, a jury returned a verdict on February 10, 2017 in favor of WSR and the individual defendants. The appeal in that case was withdrawn, and that judgment is now final.

### B. The share price dispute

The merger plan contemplated that WSR would pay Elysa and Lauren the fair value of their shares. To that end, WSR hired Jay Dunbar, CPA, to value the company as of June 30, 2016. Dunbar concluded the company was worth $16,921,000 on that date, which equates to a $68.02 price per share. Elysa and Lauren hired their own valuation expert, Steele Jones, CPA, who disagreed with several of Mr. Dunbar's premises and conclusions. Elysa and Lauren objected to the proposed merger and invoked their dissenting rights under Section 10.356 of the Texas Business Organizations Code if WSR proceeded with the merger. As we explain in more detail below, that provision allows a court to determine through appraisal the fair value of minority shares in a corporation. The merger indeed closed, and thereafter Elysa and Lauren demanded a buyout of their shares for a substantially higher value. The company refused, and instead stood by its $68.02 per share price valuation.

### C. The current suit to value the stock

Based on the inability to reach an agreement as to the share price, Elysa and Lauren filed this lawsuit asking the trial court to appoint an independent appraiser to determine the fair value of their share ownership. The petition also asserted a fraud claim asserting that "WSR used a squeeze-out merger to perpetuate fraud and truncate minority shareholder rights." Based on the fraud allegations, Elysa and Lauren asked the trial court to declare the December 7, 2016 merger

3

null and void. The petition also claims that WSR fraudulently prepared its 2016 tax return in such a way that Elysa and Lauren paid excessive income tax. The predominate theme of the proceedings below, however, addressed the share price, which is where we begin.

## II. APPRAISAL RIGHTS

### A. Applicable law

To prevent minority stock interest from becoming mere "change left on the counter," the Texas courts and legislature have weaved together some measure of protection against oppression of minority shareholder rights. *Patton v. Nicholas*, 279 S.W.2d 848, 854 (Tex. 1955); *see also Ritchie v. Rupe*, 443 S.W.3d 856, 884 (Tex. 2014) (describing statutory and common law protections).

One of these statutory protections provides that in general, a voting shareholder of a for-profit corporation who dissents to a plan of merger is entitled to "obtain the fair value of [their] ownership interest through an appraisal." TEX.BUS.ORGS.CODE ANN. § 10.354(a)(2). The Texas Business Organizations Code sets out a comprehensive scheme for what transactions qualify for protection, the substance and timing of notices that must be given, and what remedies are available when a minority shareholder "dissents" from a merger transaction. *Id.* § 10.351-10.368; *Kruse v. Henderson Texas Bancshares, Inc.*, 586 S.W.3d 118, 121 (Tex.App.--Tyler 2019, no pet.) (summarizing statutory scheme). Assuming the application of those provisions, and assuming timely compliance with the respective notice provisions (none of which are challenged in this case), the dissenting minority shareholder may file a lawsuit requesting a determination of the fair value of the minority owner's ownership interests. TEX.BUS.ORGS.CODE ANN. § 10.361.

In such a suit, the trial court may appoint one or more qualified appraisers to determine the fair value of the ownership interest. *Id.* § 10.361(d). "Fair value" is a defined term that does not

allow the appraiser to consider discounts for lack of a control premium, nor discounts for minority ownership or lack of marketability. *Id.* § 10.362. The appraiser "is entitled to examine the books and records of a responsible organization and may conduct investigations as the appraiser considers appropriate." *Id.* § 10.363. Both the dissenting owner and responsible organization "may submit to an appraiser evidence or other information relevant to the determination of the fair value of the ownership interest[.]" *Id.*

The appraiser then submits a report to the court. If either party objects to the report, the court must "hold a hearing to determine the fair value of the ownership interest that is the subject of the report." *Id* § 10.364(b). Following the hearing, "the court shall require the responsible organization to pay to the holders of the ownership interest the amount of the determined value with interest" as directed by the statute. *Id.* When applicable, the appraisal remedy is exclusive:

> In the absence of fraud in the transaction, any right of an owner of an ownership interest to dissent from an action and obtain the fair value of the ownership interest under this subchapter is the exclusive remedy for recovery of:
>
> (1) the value of the ownership interest; or
>
> (2) money damages to the owner with respect to the action.

*Id.* § 10.368.

### B. The appraisal in this case

After the suit was filed in this case, the trial court appointed Jackson Curlin, a CPA and Certified Valuation Analyst, to appraise the value of WSR as of December 6, 2016 (the day just prior to the merger). Neither party questioned Curlin's qualifications. His final report concluded that WSR had a total value of $21,082,355 on December 6, 2016, which equates to an $84.75 share price. But as Curlin noted below, "the valuation of a business is a balance between art and science; the professional judgment of the valuation analyst is an important part of this consideration." Elysa

5

and Lauren challenged his finding, and the trial court held an evidentiary hearing to determine the fair value.

Curlin testified at the hearing and explained that he considered several appraisal methods but settled on an "asset" model. As a part of that model, he valued the land, inventory, and equipment held by WSR. Neither party questioned the assigned value to the land or inventory. Instead, much of the hearing was devoted to the value of some 1400 pieces of listed equipment. WSR's internal accounting documents had assigned a "book value" to each of those items. Because some of the equipment might have been fully depreciated, but was still in use, Curlin needed to decide if the book value truly approximated the market value. To do so, he identified fifty pieces of equipment for examination by a certified equipment appraiser. For the forty-four pieces of equipment that the appraiser was actually able to locate, the market value exceeded the book value in the aggregate by $1,476,668.

Elysa and Lauren requested that Curlin identify an additional 88 pieces of equipment. Curlin declined, believing any incremental increase in the value would be immaterial. Elysa and Lauren then initiated their own appraisal of that equipment that netted an additional $329,716 in excess over book value. Curlin agreed that sum should be added to his total value for the company. From both the equipment appraisal that Curlin had authorized, and the additional appraisal that Elysa and Lauren commissioned, the parties were able to develop a "multiplier" that could be applied to the balance of the 1400 pieces of listed equipment to similarly assign any value above book value. Elysa and Lauren argued for a 1.64 multiplier. Curlin testified that he could not justify any application of a multiplier to the non-appraised inventory, but if one was used, he favored 1.5.

6

## C. The trial court's ruling

The trial court adopted Curlin's valuation, subject to several modifications. The most significant modification applied the 1.5 multiplier to the balance of the equipment and personal property that had not been specifically appraised. The trial court also added the $329,716 from the appraisal of the additional 88 pieces of equipment that Elysa and Lauren had commissioned, and a $35,000 adjustment that we discuss below. In total, the trial court placed WSR's value at $22,478,245 just prior to the merger. That resulted in a stock price of $90.36 per share, thus requiring the payment of $1,684,374.20 each to Elysa and Lauren, once interest was added.[1] WSR tendered that amount. The trial court issued findings of fact and conclusions of law in support of its ruling. Elysa and Lauren filed a motion for new trial that was overruled, and they are now before us, advancing two issues.

## D. Elysa and Lauren's complaints

In their first issue, Elysa and Lauren contend that WSR acted fraudulently in how it participated in the valuation process. Specifically, they contend that the record conclusively establishes WSR's fraud in misleading or lying to the court-appointed appraiser. The subparts to this argument focus on (1) overstating the amount of money WSR incurred in defending and settling a wrongful discharge suit, (2) sharing deflated real property values with the court-appointed appraiser, (3) declaring a dividend after the merger, (4) refusing to provide equipment valuations used for insurance purposes, and (5) not allowing the appraiser to review executive compensation data.

---

[1] In summary, WSR first proposed a buy-out for $68.02 per share. By filing this lawsuit, Elysa and Lauren were able to have a court-appointed appraiser review the company who assigned an $84.75 share price. By challenging the court-appointed appraiser on certain questions, they were able to obtain $90.36 for each of their shares.

In their second issue, Elysa and Lauren contend that WSR front-loaded profits into its 2016 pre-merger financials, and back loaded losses into Argentum post-merger 2016 financial. The net effect of that practice resulted in a higher tax liability to them.

## III. DISCUSSION

### A. Res judicata

The parties first spar over whether the fraud claims are barred by res judicata. WSR notes that Elysa and Lauren pursued fraud claims in the first lawsuit which sought to block or undo the merger. For instance, the pleading in that suit alleged that WSR and other defendants pursued the merger to "squeeze out" the minority shareholders, did so at an "unfair price" and through an "unfair process," and performed its valuation "in an unreasonable amount of time" while using "unreasonably low value[s] of real and personal property[.]" Those claims, as well as other fraud claims, were all decided adversely to Elysa and Lauren.

The pleading in this lawsuit alleges that WSR "used a squeeze-out merger to perpetuate fraud and truncate minority shareholder rights." It also claims "[t]he merger's purpose, process and price were subject to fraud, and as a result, the entirety of the transaction is fraudulent." Elysa and Lauren similarly sought to have the trial court declare the merger null and void. WSR, however, contends that they cannot, in this lawsuit, relitigate fraud claims that seek the same relief as in the first lawsuit.

Res judicata (claim preclusion) and collateral estoppel (issue preclusion) bar re-litigation of issues or cases between parties which have already been decided. *See Puentes v. Fannie Mae*, 350 S.W.3d 732, 739 (Tex.App.--El Paso 2011, pet. dism'd); *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 137 (Tex.App.--El Paso 1997, pet. denied). A party successfully raises a res judicata defense by proving the following elements: (1) a final prior judgment on the merits by a court of

8

competent jurisdiction; (2) the identity of the parties, or those in privity with them; and (3) a second action based on the same claims which were raised, or could have been raised, in the first action. *Puentes*, 350 S.W.3d at 739. Likewise, a party successfully raises a collateral estoppel defense by proving (1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; (3) the parties were cast as adversaries in the first action. *Mendoza v. Bazan*, 574 S.W.3d 594, 605 (Tex.App.--El Paso 2019, pet. denied).

In applying claim or issue preclusion, we employ a transactional approach that pragmatically gives weight to whether the facts of the two claims are "related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a trial unit conforms to the parties' expectations or business understanding or usage." *Barr v. Resolution Tr. Corp. ex rel. Sunbelt Fed. Sav*., 837 S.W.2d 627, 631 (Tex. 1992), *quoting* Restatement of Judgments § 24(2).

WSR filed a partial summary judgment motion below that asserted res judicata as a defense. The trial court granted the motion which has not been appealed. We read the record, however, to limit that ruling to the general allegations in Elysa and Lauren's petition attacking the merger as an improper means for divesting them of their shares. We would also consider the res judicata defense to preclude any consideration of Jay Dunbar's first valuation of WSR for June 30, 2016, or similar pre-merger events and evidence.

Elysa and Lauren correctly point out that the acts of fraud of which they complain relate to WSR's interactions with the court-appointed appraiser which necessarily post-date the jury verdict in the first trial. They also complain about the impact of the 2016 tax returns that were not filed until September 2017, well after the first trial. These claims, although both involving the same

9

parties and arising out of the merger, are distinct transactions in time, and they could not have been paired with the issues in the first trial (if for no other reason than the key events had not even occurred by the time of the first trial). We therefore limit our consideration of the facts to WSR's conduct vis-à-vis the court-appointed appraiser and the tax returns.

One overlap between the first suit and this lawsuit is the relief sought. In both lawsuits, Elysa and Lauren asked the respective courts to unwind the merger. The question of whether that relief is even available here places the cart before the horse. First, we must decide if any right was violated that would allow Elysa and Lauren a remedy in the first place.

## B. Standard of review

This case comes to us following the bench trial. As such, the trial court's findings of fact "have the same force and dignity as a jury's verdict upon questions." *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). Those findings of fact may be reviewed for legal and factual sufficiency under the same standards that are applied in reviewing evidence to support a jury's answer. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). We review its conclusions of law, however, de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

When a party attacks the legal sufficiency of an adverse finding on an issue on which they have the burden of proof, the party must demonstrate that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chemical Company v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). The appellate court first examines the record for evidence that supports the finding, while ignoring all evidence to the contrary unless a reasonable fact finder could not. *Dow Chemical*, 46 S.W.3d at 241; *City of Keller v. Wilson*, 168 S.W.3d 802, 821-22 (Tex. 2005). If there is no evidence to support the

10

finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Dow Chemical*, 46 S.W.3d at 241.

And to the extent we need to do so, we would sustain a legal sufficiency challenge only when (1) there is "a complete absence of evidence of a vital fact," (2) "the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact," (3) there is "no more than a mere scintilla" of evidence proving a vital fact, or (4) the evidence conclusively establishes the opposite proposition of a plaintiff's proffered vital fact. *City of Keller*, 168 S.W.3d at 810.

## C. Elements of fraud

As we note above, when applicable, the appraisal remedy is the exclusive remedy for a minority shareholder who is squeezed out following a merger "[i]n the absence of fraud in the transaction[.]" TEX.BUS.ORGS.CODE ANN. § 10.368. Elysa and Lauren seize on this statutory language to suggest that if there is fraud, they are entitled to additional relief. WSR contends that the statute requires fraud in the underlying transaction and does not reach fraud in the appraisal process. No reported case allows for a remedy for fraud in the appraisal process. And based on the prior lawsuit, any claim for fraud in the underlying transaction is barred.

Even assuming that fraud in the appraisal process is actionable, Elysa and Lauren were required to prove fraud with its four elements: (1) a material false representation, (2) made with knowledge or recklessness as to its falsity, (3) with the intent to induce reliance, and (4) reliance causing injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001); *Restrepo v. Alliance Riggers & Constructors, Ltd.*, 538 S.W.3d 724, 750 (Tex.App.--El Paso 2017, no pet.). Some of their complaints turn on the failure to disclose information to the appraiser. Non-disclosure is a subcategory of fraud and is actionable when a party has a duty to disclose and

11

the non-disclosure is as misleading as a positive misrepresentation of facts. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). Phrased as a non-disclosure fraud claim, they were required to show that WSR (1) concealed or failed to disclose a material fact known by it, (2) WSR knew the appraiser was ignorant of the facts and did not have an equal opportunity to discover the truth; (3) it acted with the intent to induce the appraiser to take some action by concealing or failing to disclose the fact, and (4) the non-disclosure caused injury. *See Hoggett v. Brown*, 971 S.W.2d 472, 486 (Tex.App.--Houston [14th Dist.] 1997, pet. denied).

Elysa and Lauren suggest in their brief that something less than fraud might also suffice. They base that assertion on language from the Houston Court of Appeals that a minority shareholder who "proves there was fraud *or irregularity* in the sale of assets that affected the fair value of his stock, [ ] may recover special damages from the corporation for the losses occasioned by the fraud *or irregularity*." *Gannon v. Baker*, 807 S.W.2d 793, 797 (Tex.App.--Houston [1st Dist.] 1991), *rev'd on other grounds*, 818 S.W.2d 754 (Tex. 1991) (emphasis supplied). This statement in turn was based on a State Bar Committee commentary on the predecessor statute to Section 10.368. *Id.* However, we take statutes as we find them. *Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 52 (Tex. 2014) ("We take statutes as we find them, presuming the Legislature included words that it intended to include and omitted words it intended to omit."). If the legislature allowed for additional remedies upon a showing of fraud, then we are constrained by that term, which is well defined in the law and known to the Texas Legislature. *See Rupe*, 443 S.W.3d at 866 ("We focus on the words of the statute, because '[l]egislative intent is best revealed in legislative language.'") (quoting *In re Office of the Attorney. General,* 422 S.W.3d 623, 629 (Tex.2013)); *Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014) ("When a statute uses a word that it does not define, our task is to determine and apply the word's common, ordinary

meaning."); *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009) ("Enforcing the law as written is a court's safest refuge in matters of statutory construction, and we should always refrain from rewriting text that lawmakers chose[.]"). We therefore decline to lessen Elysa and Lauren's burden, and look to determine if they conclusively prove fraud.

### D. Fraud related to the court-appointed appraiser

Elysa and Lauren's brief outlines in its statement of facts a number of claimed false disclosures or claimed material omissions of fact made by WSR to Curlin, the court-appointed appraiser. The argument portion of their brief is less precise in how these disclosures or omissions meet the elements of a fraud claim. Curlin testified that overall, he felt like he got "100 percent cooperation" from WSR. And looking at the five matters of which Elysa and Lauren complain, we conclude that they have failed to conclusively establish any injury, even had there been some fraudulent representation or omission.

The first action that Elysa and Lauren complain of relates to a wrongful termination lawsuit filed against WSR before the merger. The company had apparently reserved $100,000 for defense and possible settlement costs, and that figure was used by Curlin in his appraisal. WSR did not inform Curlin, however, that it carried insurance for the claim which limited the company's exposure to a $50,000 deductible. WSR's CEO, Lane Gaddy, told Curlin that the case settled after the valuation date for an amount "close to" the estimated settlement amount, but details of the settlement were confidential and could not be disclosed.

Elysa and Lauren were able to develop evidence that WSR had actually incurred only $65,000 between settlement and defense costs. Upon learning of that fact on the witness stand, Curlin agreed that $35,000 should be added to his valuation of the company. The trial court did so which is included as part of the judgment. Setting aside whether a $35,000 variance in the value

13

of a $22 million-dollar company is material, or whether there was an intent to deceive the appraiser, we conclude that there was no proven injury arising from any omission regarding the wrongful discharge claim.

Second, Elysa and Lauren complain that WSR's chosen appraiser, Jay Dunbar, shared one of his appraisals with Curlin that contained depressed property values. Dunbar had done two appraisals. One was pre-merger. The other was done after the first suit was tried and appraised WSR's value as of December 6, 2016. In the second appraisal, Dunbar determined the value of the company to be $19,340,305, which equates a per share stock price of $77.74. Dunbar used central appraisal district values for the land owned by WSR. Elysa and Lauren, however, claim that the central appraisal district undervalued the real property when compared to the actual appraisals that Curlin had commissioned and used in his final report. But Elysa and Lauren's own expert, Steele Jones, could not identify any harm to Curlin reviewing Dunbar's records. Nor did the parties ever contest Curlin's real property valuations. We fail to see how sharing a report that Curlin was never shown to rely on, proves each of the elements of fraud.

Third, Elysa and Lauren complain that WSR failed to disclose to them or to Curlin that it intended to make post-merger distributions. Whether that fact was disclosed to Elysa and Lauren before the merger would be barred by res judicata, as it would an issue for the first lawsuit. They also fail to show that Curlin was not aware of the distributions (made by Argentum), or that it would make any difference to a valuation on a date immediately prior to the merger.

Fourth, Elysa and Lauren contend that WSR denied Curlin access to insurance policies that contained valuations of WSR's equipment. Curlin had asked Lane Gaddy for the insurable values placed on the WSR's equipment in its insurance policies. After getting no response, Curlin raised the issue again with Lane Gaddy on a subsequent visit to the facility. Gaddy declined to provide

14

the policies, in part, because WSR insured its equipment at replacement cost, and not market value. In discovery, Elysa and Lauren obtained the insurance policies, which show WSR insures the equipment at ACV (actual cash value) and not replacement cost. When shown the insurance policies on the witness stand, Curlin only said that the policies would have corroborated the values he used and he "would like to have seen them[.]" He never testified, however, that it would have made a difference in his valuation. Elysa and Lauren's expert also could not say the insurance policies would affect the valuations.

Finally, Elysa and Lauren complain that WSR tried to interfere with Curlin's ability to consider executive compensation. The interference, however, was a letter that Dunbar wrote to Curlin (carbon copied to all parties) arguing that the amount of executive compensation should not, as an accounting matter, be considered. Elysa and Lauren's expert, Steele Jones, promptly responded with arguments as to why it should be considered. Again, there is no testimony that either of these letters adversely influenced Curlin in his valuation.

None of Elysa and Lauren's claims about WSR's interactions with Curlin were shown to have actually influenced his opinion. Because injury is an element of a fraud claim, they fail to establish that element. It might be possible that if WSR had mislead Curlin, and Elysa and Lauren incurred costs to counter that action, the trial court might have had some basis to compensate them for that loss, either as an element of damage, or sanction for interfering with its appointed expert. None of that kind of evidence is shown on this record. We accordingly overrule the first issue.

### E.  Fraud in allocating profit and losses in the merger year

Elysa and Lauren's second issue claims that WSR filed tax returns in such a way as to increase their tax liability for 2016. Through the testimony of their accounting expert, Steele Jones, they contend that WSR front loaded profits into the period of time when they were shareholders,

and backloaded losses into the time when they were no longer shareholders. Because WSR is an S-Corporation, its tax liabilities are passed through to its shareholders.

Jones focused on two 2016 tax returns. One was filed by WSR and covered the period from January 1st to December 6, 2016. He testified the second return covered the last twenty-four days of 2016 (December 7th to December 31st). In his words; "the income from the second period doesn't bear any kind of relationship to the income from the first period in terms of the gross profit percentage. That leads me to believe that a less-than-thorough job was performed in measuring the income at the end of the first period . . . ."[2] He noted that the January 1st to December 6th tax return reported a gross profit of $11,800,000 while the second return for the last twenty-four days of December showed a $362,000 loss.[3] He testified that allocation of the profit in this way increased Elysa's tax burden by close to $30,000 and Lauren's by $17,000 to $20,000.

WSR countered this testimony two ways. First, it developed that Steele Jones had assumed that there was a single entity that filed two tax returns for the different time periods in the same calendar year. But in fact, one return was filed for WSR for 2016 up to December 6th. The other return was filed by Argentum for the period October 12, 2016 to December 31, 2016. Each entity has its own tax identification number. When confronted with that fact, Jones agreed his assumption was incorrect, but claimed his analysis was "still pretty close" or "still accurate." The trial court acknowledged the distinction between the legal entities, however, and made a specific

---

[2] When asked how a company that is profitable for the first 11 months of a year could show a loss in the last 24 days of the month, Jones said, "[m]y supposition" is that the company used internal financial statements that had as yet not been audited and which had not made inventory adjustments.

[3] Jones also claimed the first return was based on financials through the end of November and did not include the first six days in December. He further questioned the application of a specific technique used to convert taxable income into a lower rate for export transactions. The return using that tax code provision combined both the pre- and post-merger periods. Jones never explained how these issues would specifically impact Elysa and Lauren.

finding that "the 2016 Tax Returns were for two separate entities which Plaintiffs' expert acknowledged."

WSR also developed testimony that (1) the tax returns were prepared by its accountants, (2) the accountants did not receive any written guidance from WSR on the matter, and (3) Lane Gaddy claimed he never instructed the accountants how to prepare the return. The trial court acknowledged this testimony through its finding that: "There was no evidence from the accountant that prepared the returns as to the reason they were prepared in this manner nor any evidence that the tax returns were intentionally prepared to cause harm to Plaintiffs." The trial court also expressly found that there was no fraud in the preparation of the 2016 tax return. It finally noted that there is no fiduciary duty to a shareholder, and no breach of any duties to Elysa and Lauren.

One predicate to Elysa and Lauren's claim is that WSR owed them as former stockholders, a fiduciary duty in the preparation of tax returns. They direct us to three out-of-state cases that recognize this specific duty. *See Abdalla v. Qadorh-Zidan*, 913 N.E.2d 280, 286 (Ind. App. 2009); *Thompson v. Cent. Ohio Cellular, Inc.*, 639 N.E.2d 462, 470 (Ohio App. 8th Dist. 1994); *Morgan v. Lanham*, 2009-CA-001412-MR, 2011 WL 918735, at *22 (Ky. App. Mar. 18, 2011) (unpublished decision). No Texas case has recognized this duty. And creation of a duty involves a complex cost-benefit analysis considering a number of factors. *Rupe*, 443 S.W.3d at 878. The Texas Supreme Court in *Ritchie v. Rupe* analyzed those factors and declined to recognize a common-law cause of action for "shareholder oppression" *Id.* at 891. We need not decide if Texas recognizes a narrow subset of that duty limited to tax returns, because on the record before us, the preparation of the tax returns could have been more a matter of accounting judgment, than a breach of a fiduciary duty.

17

The testimony in this case allowed the trial judge to find that any error in the return was made by the accountants and not WSR's principals. WSR's accountant could not identify any direction from WSR in how the return was to be prepared, and WSR's principal claimed he gave none. The only countering evidence was Steele Jones' claim it would be "hard for [him] to imagine" that the accountant or WSR or both would not know the impact of the returns on the shareholders. He conceded, however, he did not know who caused the error. At most, he was able to testify how the tax return would have been prepared in his office. His testimony does not conclusively establish fraud or breach of a fiduciary duty by WSR in the preparation of the tax return. Merely alleging that certain actions fall within the scope of a fiduciary do not convert what is otherwise a professional negligence claim into a claim for breach of fiduciary duty. *Murphy v. Gruber*, 241 S.W.3d 689, 693 (Tex. App.--Dallas 2007, pet. denied) (in context of attorney-client). And fraud requires a misrepresentation made with knowledge or recklessness as to its falsity. *Ernst & Young*, 51 S.W.3d at 577; *Restrepo*, 538 S.W.3d at 750. Because Elysa and Lauren fail to conclusively establish any fraud or breach of a fiduciary duty in the preparation of the 2016 tax return by WSR, we overrule their second issue. Having done so, we find no need to determine if unwinding the merger would be an available remedy based on the allegations made here. The judgment below is affirmed in all respects.

JEFF ALLEY, Chief Justice

February 21, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.